Receipt number 9998-5200140

## UNITED STATES COURT OF FEDERAL CLAIMS

E&I GLOBAL ENERGY SERVICES,
INC. and E&C GLOBAL, LLC

      Plaintiffs,

           v.

THE UNITED STATES OF AMERICA
      Defendant.

Civil Action No.:    **19-244 C**

---

## COMPLAINT
## CONTRACT DISPUTE OF
## E&I GLOBAL ENERGY SERVICES, INC.
## CONTRACT NUMBER DE-WA0003661

---

Joseph A. Whitcomb
Whitcomb, Selinsky, McAuliffe, PC
Tower One, Suite #9500
2000 S. Colorado Blvd.
Denver, CO 80204
(303) 534-1958 Telephone
(303) 534-1949 Fax
E&I Global Energy Services, Inc.

February __, 2019

**COMPLAINT**

**CONTRACT DISPUTE**
**E&I GLOBAL ENERGY SERVICES, INC.**

1.      Plaintiffs E&I GLOBAL ENERGY SERVICES, INC., a Minnesota corporation, and E&C Global, LLC ("E&I," "Plaintiffs"), by and through its undersigned counsel, hereby sues the United States Department of Energy, Western Area Power Administration (WAPA), the Defendant, and for its causes of action against the Defendant alleges: The WAPA fraudulently induced the Plaintiffs to assume responsibility for performance and payment bonding via a Tender Agreement, and fraudulently induced the Plaintiffs to enter into a Completion Agreement whereby Plaintiffs agreed to continue the work of WAPA construction contract number DE-WA0002620 after WAPA terminated the contract of the original awardee Isolux Corsan, LLC ("Isolux"). WAPA subsequently induced the Plaintiffs to execute construction contract number DE-WA003661, VT Hanlon [electrical] Substation, dated April 13, 2017, that incorporated the Tender Agreement by reference but not the Completion Agreement.

2.      The Plaintiffs further alleges that Defendant fraudulently induced the Plaintiffs to: (1) subcontract with the same subcontractors and same suppliers that the original terminated contractor used, without telling Plaintiffs that the terminated original contractor had not fully paid said subcontractors and suppliers; (2) that Defendant made false representations about equipment and supplies purportedly present at the worksite or in warehouses awaiting shipment and regarding the amount of work that the terminated contractor had completed; (3) that the Defendant wrongfully and in bad faith failed to approve change orders and schedule adjustments requested by the Plaintiffs pursuant to FAR 52.243-4 – Changes, despite the fact that the requested changes resulted from factors beyond the control of the Plaintiffs and largely caused by the WAPA's actions; (4) that Defendant wrongfully and in bad faith failed to pay Plaintiffs' invoices as required

by FAR § 52.232-27 – "Prompt Payment for Construction Contracts"; and (5) that the Defendant, in violation of FAR § 49.402-3 Procedure for Defaults, and FAR § 52.249-10 – Default (Fixed-Price Construction) wrongfully and in bad faith terminated the Plaintiffs' contract for default even though Plaintiffs had completed 95% of the work of the contract, and had submitted to WAPA ample and compelling evidence establishing that the Plaintiffs' delay in completing the work of the contract arose from unforeseeable causes beyond the control and without the fault or negligence of the Plaintiffs.

## PARTIES

3.      E&I is a small business that provides electrical and instrumentation construction, commissioning, maintenance, construction management, communication, manufacturing & factory/plant relocation services under Federal contracts to the U.S. Government. E&I was a subcontractor on WAPA contract number DE-WA0002620, VT Hanlon [electrical] Substation, in South Dakota. E&I subsequently assumed the prime contractor's responsibilities pursuant to a Completion Agreement (Exhibit 1, "Completion Agreement"), Tender Agreement (Exhibit 2, "Tender Agreement"), and WAPA contract number DE-WA0003661, VT Hanlon Substation (Exhibit 3, the "Follow-On Contract"), after WAPA terminated the original prime contractor Isolux.

4.      The Defendant, the United States of America, United States Department of Energy, Western Area Power Administration procures products and services through Federal contracts for the United States Government ("WAPA").

## JURISDICTION

5.      This contract-disputes action is brought under, and jurisdiction is vested in this court through the Tucker Act, 28 U.S.C.A. § 1491(a)(l) and (a)(2) (West). "[T]he Contract

Disputes Act of 1978 ("CDA"), 41 U.S.C. §§ 7101–7109, . . . is a 'money-mandating source of law sufficient to confer jurisdiction in [the Court of Federal Claims] under the Tucker Act.' *Kellogg Brown & Root Servs., Inc. v. United States,* 115 Fed.Cl. 168, 171 (2014); *accord* 28 U.S.C. § 1491(a)(2) (providing jurisdiction in the Court of Federal Claims to hear disputes arising under the CDA)." *Canpro Investments Ltd. v. United States*, 130 Fed. Cl. 320, 335, *reconsideration denied*, 131 Fed. Cl. 528 (2017).

6.      This complaint is timely.  In a letter to the WAPA contracting officer dated October 1, 2018, the Plaintiffs gave WAPA notice of its claims pursuant to the Contract Disputes Act, 41 U.S.C.A. § 7103(a) (West) and Federal Acquisition Regulation (FAR) 52.233-1 "Disputes," which is incorporated by reference in the Plaintiffs' Follow-On Contract. The letter asserted claims in excess of $100,000 and included the certification required by 41 U.S.C. § 7103(b) and FAR 52.233-1(d)(2)(iii).  The amount of the Plaintiffs' claim is $3,605,289.80. The contracting officer failed to respond or advise Plaintiffs when it expected to respond, within the 60 days required by 41 U.S.C. § 7103(f)(2) and FAR 52.233-1(e) so E&I's claim was deemed denied on November 30, 2018. The WAPA contracting officer subsequently denied the Plaintiffs' claims in a letter dated December 17, 2018 wherein the contracting officer stated that "This is the final decision of the Contracting Officer." Therefore, E&I is pursuing this appeal of the Contracting Officer's final decision (COFD) pursuant to the CDA. Thus, the Plaintiffs has satisfied all prerequisites to this suit and has filed this case less than twelve-months after the deemed denial of its claim and the COFD as required by 41 U.S.C. § 7104(b)(3).  If follows that the court has subject-matter jurisdiction in this case.

## STANDING

7.      "'[T]o have standing to sue the sovereign on a contract claim, a Plaintiffs must be in privity of contract with the United States.' *P. Gas and Electric Co. v. United States*, 838 F.3d 1341, 1350 (Fed. Cir. 2016), *citing Anderson v. United States*, 344 F.3d 1343, 1351 (Fed. Cir. 2003); *Peterson Indus. Depot, Inc. v. United States*, No. 17-876C, 2018 WL 5118301, at *8 (Fed. Cl. Oct. 22, 2018). The Plaintiffs has privity with the U.S. Government by virtue of the Completion Agreement, the Tender Agreement, and its WAPA prime contract No. DE-WA0003661, VT Hanlon Substation. It follows that the Plaintiffs has standing to sue in this court.

## STANDARDS OF REVIEW

8.      Generally, the Court of Federal Claims scope of review is governed by 5 U.S.C. § 706:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--
>
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be--
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) contrary to constitutional right, power, privilege, or immunity;
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (D) without observance of procedure required by law;
>
> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
>
> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C.A. § 706 (West)

9.      With respect to a termination for default, "Courts and boards hold the government to a high standard when terminating a contract for default because of the adverse impact such an action has on a contractor." 2015 Contract Attorneys Deskbook, Contract & Fiscal Law Department, The Judge Advocate General's School, at Vol. 2, 25-2, *citing Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765  (Fed. Cir. 1987) (holding that "termination for default is a drastic sanction that should be imposed upon a contractor only for good cause and in the presence of solid evidence."); *Mega Constr. Co. v. United States*, 25 Cl. Ct. 735 (1992). "Prior to issuing a default termination notice, contracting officers must have a valid basis for the termination, must issue proper notices, must account for the contractor's excusable delay, must act with due diligence, and must make a reasonable determination while exercising independent judgment." *Id.; See* FAR 49.402-3.  "A contractor's technical default is not determinative of its propriety. The Government must exercise its discretion reasonably to terminate a contract for default." *Id., citing Darwin Constr. Co. v. United States*, 811 F.2d 593,  (Fed. Cir. 1987).

10.      In *Lisbon Contractors, Inc. vs. the United States* the U.S. Court of Appeals for the Federal Circuit said: "[Termination for Default] does not require absolute impossibility of performance by the contractor before the government may declare the contract in default. *See Discount Co. v. United States*, 554 F.2d 435, 441, 213 Ct.Cl. 567, *cert. denied*, 434 U.S. 938, 98 S.Ct. 428, 54 L.Ed.2d 298 (1977). Nor does it permit default termination merely on the ground that performance is less than absolutely certain. Rather, we construe the contract, as did the Claims Court, to require a reasonable belief on the part of the contracting officer that there was "no

reasonable likelihood that the [contractor] could perform the entire contract effort within the time remaining for contract performance." *RFI Shield-Rooms*, ASBCA Nos. 17374, 17991, 77–2 BCA (CCH) ¶ 12,714, 61,735 (Aug. 11, 1977); *see also Discount*, 554 F.2d at 441 (justifiable insecurity about the contract's timely completion required). *Lisbon Contractors, Inc., supra* at 765.

11.     In *McDonnel Douglas vs. the United States*, the United States Court of Appeals for the Federal Circuit held that:

> The pragmatic approach we adopted in *Lisbon* achieves that desired balance and provides the proper interpretation of the default clause.[1] Like this case, *Lisbon* involved a default termination of a contractor for failure to prosecute with diligence, despite the fact that the contractor still had time to complete performance of the contracted project. *Lisbon,* 828 F.2d at 765–66. After determining that the government bore the burden of proof in justifying a default termination, *1016 id.* at 765, we clarified that "the government did not, as it urges, satisfy its burden by merely showing that the contractor was behind schedule." *Id.* Rather, we construed the default provision to "require reasonable belief on the part of the contracting officer that there was no reasonable likelihood that the contractor could perform the entire contract effort within the time remaining for contract performance." *Id.* (internal quotation marks and brackets omitted) (quoting *RFI Shield–Rooms,* ASBCA Nos. 17374, 17991, 77–2 BCA ¶ 12,714, 61,735 (Aug. 11, 1977), and citing *Discount,* 554 F.2d at 441). Since then, we have adopted that formulation as the controlling standard in default cases involving a failure to make sufficient progress.[2] *See, e.g., Danzig v. AEC Corp.,* 224 F.3d 1333, 1336–37 (Fed.Cir.2000) (indicating that the ASCBA properly applied the *Lisbon* standard in reviewing a default termination for failure to make progress). We again reaffirm in this case that the test formulated in *Lisbon* controls the determination of whether the government justifiably default terminated a contractor for failure to make progress.
>
> In applying that standard, we have required that the contracting officer's termination decision be based on tangible, direct evidence reflecting the impairment of timely completion. *See Lisbon,* 828 F.2d at 766 ("At trial, the government did not offer *direct* testimony or any other *direct* evidence on the time which it estimated it would take Lisbon to complete the contract."). In other words, a court's review of default justification does not turn on the contracting officer's subjective beliefs, but rather requires an objective inquiry. *Id.* at 766–67 (reviewing evidence underlying government's default termination). Although the contracting officer's testimony and contemporaneous documents are relevant to that determination, *id.* at 766, the trial court may also consider other factors usually relied upon by courts and contract boards, such as a comparison of the percentage of work completed and the amount of time remaining under the contract, *see, e.g., Thomas & Sons, Inc.,* ASBCA No.

51,874, 01–1 B.C.A. (CCH) ¶ 31,166 (ASBCA Nov. 13, 2000); *Nat'l Interior Contractors, Inc.,* ASBCA No. 46,089, 96–2 B.C.A. (CCH) ¶ 28,370 (1996); *1017 the contractor's failure to meet progress milestones, *see, e.g., James E. Kennedy, Tr. v. United States,* 164 Ct.Cl. 507, 512 (1964); *AAR Corp.,* ASBCA No. 16,486 et al., 74–2 B.C.A. (CCH) ¶ 10,653 (A.S.B.C.A. Apr.24, 1974); problems with subcontractors and suppliers, *see, e.g., Abcon Assocs., Inc. v. United States,* 49 Fed.Cl. 678, 686–87 (2001); the contractor's financial situation, *see, e.g., Universal Fiberglass,* 537 F.2d at 395–96, 398; as well as a contractor's performance history, *see, e.g., Decker & Co. v. West,* 76 F.3d 1573, 1581 (Fed.Cir.1996); and other pertinent circumstances surrounding the decision in order to determine whether the contracting officer had a valid basis for his conclusions. *Lisbon,* 828 F.2d at 766–67; *see also Discount,* 554 F.2d at 441 ("The record is plain, however, that the default termination was not based on this demand *per se* but rather on the over-all evidence of Discount's failure to prosecute diligently its work under the contract."); *L & H Constr. Co.,* ASBCA No. 43,833, 97–1 B.C.A. (CCH) ¶ 28,766 (ASBCA Feb. 5, 1997) ("The Government owes the contractor no less than an assessment of all the relevant circumstances when it exercises its discretion under the default clause.").

*McDonnell Douglas Corp. v. United States*, 323 F.3d 1006, 1015–17 (Fed. Cir. 2003).

12.    "It is the government's burden to prove, by a preponderance of the evidence, that the termination for default was proper." 2015 Contract Attorneys Deskbook*, supra* at Vol. 2, 25-2, *citing Lisbon Contractors, Inc. v. United States*, 828 F.2d 759,  764 (Fed. Cir. 1987); *Walsky Constr. Co.*, ASBCA No. 41541, 94-1 BCA ¶ 26,264. "Once the government has met its burden of demonstrating the appropriateness of the default, the contractor has the burden of proof that its failure to perform was the result of causes beyond its control and without fault on its part." *Id., citing International Elec. Corp. v. United States*, 646 F.2d 496,  (Ct. Cl. 1981); *Composite Int'l, Inc.*, ASBCA No. 43359, 93-2 BCA ¶ 25,747; *Centurion Electronics Service*, ASBCA No. 48750, 2000-1 BCA ¶ 30,642 at 151,325.

## FACTUAL BACKGROUND

13.  In October 2015 WAPA awarded a $9,982,018.80 contract to Isolux to provide all labor, materials, equipment, transportation and other resources to complete the construction of a new high voltage VT Hanlon Substation in South Dakota.  According to the solicitation, DE-SOL-0007930 (Exhibit 4, "Isolux Solicitation") and Contract Number DE-WA0002620 (Exhibit 4, the "Isolux Contract"), the magnitude of the project was between $5,000,000 and $10,000,000.  All work was to be completed within 545 days of Notice to Proceed.  The principal components of the work to be performed included:

- excavation and site development,

- removal of transmission line structures,

- installation of concrete foundations,

- provide and install galvanized steel structures,

- provide and install equipment such as distribution and station service transformers, disconnect switches,

- install Government-furnished power circuit breakers, and

- construct a service building.

Exhibit 4.

14.  E&I worked as a subcontractor to Isolux on the Isolux contract.

15.  WAPA subsequently terminated Isolux for default on December 2, 2016.

16.  In December of 2016, WAPA asked E&I to take over the prime contract as it was already working as a subcontractor on the project. WAPA also encouraged E&I to execute subcontracts with the subcontractors that were already working on the project as subcontractors to Isolux. E&I agreed to do both.

17.  On March 28, 2017 E&I executed a Tender Agreement with WAPA and Isolux's surety, Liberty Mutual.  Exhibit 2.  Liberty Mutual negotiated the agreement on its own behalf and on behalf of its underwriter The Insurance Company of the State of Pennsylvania.  The Tender Agreement says, among other things:

> Sureties hereby tender [E&I] to [WAPA], and [WAPA] accepts such tender of [E&I]. By execution of this Agreement, [WAPA] agrees to assume all obligations of Sureties, as applicable, under the Completion Agreement and will be entitled to all of the rights, remedies, and benefits of the Completion Agreement as it relates to [E&I] . . . .

> Exhibit 2, Paragraph 2.

18.  On March ?, 2017 (day not entered in agreement) E&I signed a Completion Agreement with WAPA and Isolux's surety Liberty Mutual and underwriter The Insurance Company of the State of Pennsylvania (Exhibit 1) that says, among other things:

> "In the event of a conflict or ambiguity between any of the [Isolux] Contract Documents and this Agreement, as between [WAPA] and [E&I], this Agreement will govern."
> Exhibit 1, Paragraph 1.

> "Exclusions" means the following items that are not included by [E&I] in the Completion Price:

> (a)  Payments due [Isolux's] vendors for materials ordered by, but not paid by, [Isolux] prior to the date of this agreement;

> (b)  Payments due [Isolux's] subcontractors or vendors for work performed for [Isolux] prior to the date of this Agreement . . . .
> Exhibit 1, Paragraph 1.

> . . . [E&I] shall not be responsible for satisfying an indebtedness associated with materials ordered by [Isolux] prior to the date of this Agreement.
> Exhibit 1, Paragraph 5.

> [E&I] will not be responsible for any payments due [Isolux's] subcontractors or vendors, including Ratified Subcontractors, for work performed for [Isolux] prior to the date of this Agreement.
> Exhibit 1, Paragraph 6.

[E&I] shall not be responsible for paying sums due any of [Isolux's] subcontractors or vendors with respect to materials ordered and/or work performed on behalf of [Isolux] prior to the date of this Agreement.
Exhibit 1, Paragraph 16.

In any dispute between [E&I], [WAPA], and or Sureties, the prevailing party will recover from the non-prevailing party the party's reasonable and necessary attorney's fees and costs, including, but not limited to, expert witness fees.

Exhibit 1, Paragraph 17.

19.   On April 13, 2017 WAPA awarded prime contract number DE-WA0003661 to E&I for completion of the VT Hanlon substation project. Exhibit 3 (the "Follow-On Contract") The Follow-On Contract says on the first page of the SF 1442 "This contract incorporates the attached Tender Agreement between Western Area Power Administration and Liberty Mutual Insurance Company for completion of work under terminated contract DE-WA0002620 [Isolux Contract]." The Follow-On Contract does not contain an integration clause that would supersede the Completion Agreement (*see* Exhibit 3), and the Tender Agreement that is incorporated in the Follow-On Contract refers to and has little meaning without reference to the Completion Agreement. *See* Exhibit 1 at page 2, paragraph 2.  Moreover, the parties never terminated the Completion Agreement. E&I would not have executed the Follow-On Contract if WAPA argued or insisted that the Completion Agreement was or would be terminated or superseded. The Completion Agreement therefore remains in full force and effect.

20.   At the inception of its performance of the Follow-On Contract, in April of 2017, E&I found that WAPA representations regarding equipment that Isolux had paid for, the equipment that was supposed to be at the jobsite or in warehouses awaiting delivery, and the electrical equipment's availability for installation in the substation were largely untrue.  WAPA paid Isolux in advance for some of this equipment, but E&I discovered that Isolux had not paid suppliers for the equipment, and it was not available for installation in the substation.  Vendors had heard that

WAPA terminated Isolux's contract, so they cancelled most of the Isolux purchase orders. Consequently, the equipment was not ready for delivery or installation, resulting in schedule delays for E&I.

21. On Thursday, April 20, 2017, WAPA hosted a VT Hanlon "kick-off" meeting (WAPA referred to this as the "pre-construction meeting"). Meeting topics included "Jobsite expectations," and "Schedule." *See* Exhibit 5, Meeting Agenda, April 20, 2017. At that meeting E&I personnel raised issues and concerns regarding the missing equipment and other site issues, and schedule impacts resulting from the missing equipment. Each of the issues raised had a significant cost component associated with them that E&I was expected to address. However, in order to estimate costs, E&I needed information from WAPA and/or Isolux and their surety Liberty Mutual, that only WAPA, Isolux and/or Liberty Mutual had. WAPA refused to address the specific cost issues. Jonathan Dittmer, the Contracting Officer, said at the April 20, 2017 meeting: "We need to hurry and get the project moving. Any issues will be addressed as they come up." Exhibit 6, Affidavit of Trevor Howard.

22. WAPA also terminated Isolux's contract without confirming that Isolux had fully paid its subcontractors and materialmen. WAPA then executed the Completion Agreement with E&I, and encouraged E&I to continue to use the same subcontractors and suppliers that Isolux used. Thus, these same subcontractors and suppliers anxiously waited for E&I to assume WAPA's and Isolux's financial obligations. Then, when work was to about to recommence pursuant to the Completion Agreement, E&I learned that most of the existing subcontractors and suppliers had not been paid in full.

23. The subcontractors refused to commence work and the suppliers refused to fill orders without full payment up-front. The Completion Agreement states that E&I will not be responsible

for paying suppliers for orders placed by Isolux prior to execution of the Completion Agreement, and that E&I will not be responsible for paying subcontractors for work performed prior to execution of the Completion Contract. Exhibit 1 at paragraph 5, page 5. Nonetheless, because E&I was concerned about completing the job on time, and in reliance upon the Contracting Officer's assurances that "any issues will be addressed as they come up," E&I paid for the missing equipment, and paid the subcontractors for amounts due from Isolux. This increased the burden on unwitting small business E&I, which hardly had the financial wherewithal to self-finance a $10-million-dollar government project. The Follow-On Contract was E&I's first large prime contract.

24. E&I presented evidence to WAPA in August 2017 that indicates WAPA knew that the prior contractor, Isolux, submitted invoices claiming it had completed a substantial amount of work that in fact was not completed. For example, Isolux submitted an invoice for installing some equipment that was secured by nonconforming bolts. Isolux directed E&I to install the nonconforming bolts so that Isolux could report the work as complete, and then included that work in their invoice. Isolux also failed to properly set switches, yet invoiced as if the work were complete. E&I immediately reported these issues to Trevor Howard, the WAPA Construction Manager.

25. Despite its knowledge of these discrepancies, WAPA accepted and paid the Isolux invoices. WAPA knew that Isolux had not completed a significant portion of the work, but it still induced E&I to sign the Completion Agreement and the Follow-On Contract based on assurances that "any issues will be addressed as they come up." E&I was therefore left to not only correct existing deficiencies without compensation, but was also directed by the government to complete the project without due consideration for the enormous costs that E&I incurred in order to complete

Isolux's nonconforming work. These were not innocent mistakes. Isolux intentionally deceived the government and WAPA was a willing participant in this deception. WAPA knew or should have known that the work had not been completed.

26.  E&I continued to raise the issue of the missing equipment up until the time that WAPA terminated E&I's contract.  In a project meeting on February 9, 2018 Contracting Officer Jonathan Dittmer acknowledged that the missing bus parts cost E&I "$300,000.00" and that other missing equipment totaled approximately $275,000.00 ("275 – 276 somewhere in there"). Exhibit 7 at page 5. However, the Contracting Officer stated that the issue of the missing equipment was between the surety Liberty Mutual and E&I. Exhibit 7 at page 6.   That statement was incorrect and mislead E&I managers into protracted discussions with Liberty Mutual, when in fact WAPA had assumed all of Liberty Mutual's obligations when it signed the Tender Agreement on March 28, 2017. Exhibit 2 at page 2, paragraph 2.  Jeff Bruce and the Contracting Officer Jonathan Dittmer discussed this in a project meeting on February 5, 2018: "Jeff says E&I can't get paid from Liberty, we can only get paid from WAPA. Johnathan says that's where the problem is, WAPA can't pay for something twice." Exhibit 9, page 1.

27.  While Contracting Officer Jonathan Dittmer was telling E&I that resolution of payment for missing equipment was between E&I and Liberty Mutual, Liberty Mutual was telling E&I the opposite.  Other statements uttered by the Contracting Officer contradict his assertion that E&I should look to the surety for payment.  Mr. Dittmer said he agreed that WAPA owed E&I payment for at least a couple of items.  Here is an excerpt from the February 22, 2018 project meeting notes:

- Jonathan says they have looked through the claims and he can't see where WAPA owes us. He said there are a couple that he would agree that they owe us but, it is nowhere near

$700,000. Jonathan told Jeff he needs to look through a few a see if E&I can get it from the bonding company.

- Jeff tells Jonathan we have a contract with WAPA not the bonding company, and he got an email from Carolyn Banks telling Jeff it is Jeff and WAPA's problem.
- Jonathan says WAPA's contract also included the completed [completion?] contract and tender agreement. He does not think Carolyn is correct in what she is saying.

Exhibit 10, page 1.

WAPA also questioned which equipment Isolux had ordered prior to execution of the Completion Agreement, claiming that items were not ordered prior to E&I's Completion and Tender Agreements because the vendors cancelled the purchase orders (which had, in fact, been placed by Isolux prior to the Completion and Tender Agreements). Exhibit 9 at Page 1.

28.    On February 13, 2018 E&I submitted documentation to the Contracting Officer Jonathan Dittmer that E&I said justified an equitable adjustment for missing equipment, directed changes, and weather delays. *See* Exhibit 8.

29.    Some of the directed changes resulted from WAPA not giving E&I a full set of approved drawings prior to executing the Completion Agreement and Follow-On Contract with E&I.  Following is an excerpt from the February 22, 2018 meeting notes:

- Jonathan says the [missing equipment invoice and supporting documentation] packet E&I sent, the documentation was "difficult" as he put it. Jeff explains to him – "when E&I bid the job on the takeover, E&I's number was a lot bigger, E&I had to dial it down and pretend we didn't know all the details about the job and E&I had to bid off the original documents that WAPA supplied to Joe Mattingly, E&I did this because they were directed by WAPA. E&I had numerous phone calls with Bill, Trevor and Jonathan that discussed the problem with Jeff bidding them is he knows certain details about the job. Jeff doesn't want to cloud the job, he is just bidding off the documents supplied.
- Jonathan tells Jeff, E&I was given up to Revision 4 in the original documents sent from WAPA.
  - Everything after that was put into Mod 1. And Mod 2. 400+ pages of documents all together.
  - The changes E&I are asking for was all given to the bonding company to give to E&I. (according to Jonathan.)

- Jeff asks Jonathan about our excel spreadsheet (WAPA Change Orders). If he has reviewed it.
  - Jonathan says they have reviewed it and built something for it. Jeff adds it would be a lot easier to compare and see what we agree and don't agree on.
  - E&I's original number to finish the VT Job is $500,000 and some change.
  - Then we had to dumb it down to the 185 drawings and Jeff didn't want to do that because he knew there were gaps and everyone kept saying "no bid it with these drawings, the other stuff will come later we don't want it to be a big fog on bidding this job because if they send it out to anyone else it will take another 2 months to get a bid on this job." It was a big push [by WAPA] for E&I to get started out on the VT Job.
  - . . . .
  - Jeff tells Jonathan, Jonathan gave Jeff different drawings than what Isolux had and that was the topic of conversation for them for weeks that it's really hard to bid a job when Jeff knows numerous other details about the job.
  - The original price was $7.5, the proposal was in Joe Mattingly's hand and their response was that they had their cost engineers go through it and there is no way. Jeff's response was that there is all this other stuff, all these holes that are missing.
  - Jonathan says all the drawings E&I weren't asked to bid off of were part of Revision 5 to Revision 9.

Jonathan says Revision 7 was a big change with a lot of drawings and that was issued to E&I after being awarded the job. And all the invoices and changes should have been part of that.

Exhibit 10, page 2

30.  On April 6, 2018 WAPA sent a letter to E&I wherein WAPA denied all of E&I's change-order requests. Exhibit 11.

31.  Because E&I had expressed concerns about completing the job on time and being able to pay its employees and subcontractors, WAPA sent a show-cause notice to E&I on April 6, 2018. Exhibit 12. The show-cause letter did not comply with the following requirements, as set forth in FAR § 49.402-3 "Procedure for Defaults," paragraph (f):

a.  There is no reference to the terms of the contract and applicable laws and regulations;

b.  There is no consideration or citation as to a specific failure of the contractor or any consideration of the causes of the failure;

c.  There is no consideration of the availability of supplies or services from other sources;

d.  There is no consideration of E&I's urgent need for subcontract services and vendor supplies or the time required for E&I to acquire them from other sources (as compared with the time delivery could be obtained from the delinquent subcontractor and supplier);

e.  There is no consideration of the effect of a default termination on E&I;

f.  There is no consideration of the effect of the termination on the ability of the contractor to pay guaranteed loans, and progress payments or advance payments to subcontractors and suppliers; and,

g.  The letter is devoid of any pertinent facts and circumstances.

h.  WAPA did not provide notice of a pending decision to terminate E&I's contract for default to E&I's sureties and the Small Business Administration.

*See* Exhibit 8.

32.  E&I's outside counsel in Minnesota responded to the show cause letter on April 20, 2018 in a detailed letter with attachments wherein E&I stated that it had not abandoned the project and explained that its inability to complete the project on time was due to factors beyond E&I's control and without fault or negligence by E&I. Exhibit 13.

33.  Despite all of these problems, E&I was able to complete 95% of the scope of work prior to WAPA's termination of the Follow-On Contract. E&I said it was 95% complete in project meeting on February 22, 2018 and Contracting Officer Jonathan Dittmer, who was present during the meeting, did not object or say that E&I had not completed 95% of the work of the contract. Exhibit 10, page 1.

34. On May 18, 2018, WAPA sent a letter to E&I notifying it that WAPA was terminating its contract for default, in its entirety, pursuant to FAR § 52.249-10, Default (Fixed-Price Construction). Exhibit 14.

35. On October 1, 2018 E&I's outside counsel in Colorado sent a Contract Disputes Act claim certified by E&I to WAPA that itemized the elements of its claim, included complete backup for each claim element, requested payment and schedule adjustments, and asked WAPA to convert its Termination for Default to a Termination for Convenience. (Exhibit 15). WAPA denied E&I's claims in their entirety in a Contracting-Officer's-final-decision letter dated December 17, 2018. Exhibit 16

36. The total amount of E&I's claim is $3,605,289.80. For the Court's convenience, E&I's claim is broken down into categories and itemized as follows:

1. Invoiced amounts owed to E&I for supplies purchased by E&I and for services provided by E&I on the VT Hanlon Substation. E&I has itemized these costs by contract CLINs as of April 13, 2017. These amounts were invoiced, but not paid. The amount of money invoiced per CLIN that WAPA has not paid is $284,110.88. Exhibit 17. The Contracting Officer also verbally agreed to pay another $74,140.01. Exhibit 18. The total claim amount for this category is $358,250.89.

2. Amount owed for supplies and services pursuant to change order requests submitted to WAPA, but never approved or paid. The amount of money WAPA owes E&I pursuant to its requested change orders is $1,257,986.44. Exhibit 19.

3. Amount owed to E&I for assuming WAPA's obligations based on false assurances and representations of the amount of work that Isolux completed, supplies that Isolux purchased that were supposedly available at the worksite, plus

equipment that was supposed to be at the worksite or in a vendor warehouse ready to ship, but was not there. The amount of money WAPA owes E&I in this category is $ 1,712,132.23. Exhibit 20.

4. Amount owed to E&I resulting from WAPA's breaches of contract and E&I's resulting reliance on its bonds. The amount of money that WAPA owes to E&I for these breaches is $209,811.24. Exhibit 21.

5. Amount owed to E&I for preparing and submitting this complaint and earlier claims presented to WAPA. The amount of money WAPA owes E&I for this expense is $67,109.00. Exhibit 22.

6. E&I's request that WAPA rescind the Termination for Default.

37.   As a result of WAPA's refusal to pay for equipment that was specifically excluded from E&I's contract pursuant to the Tender and Completion Agreements, and WAPA's refusal to issue change orders and pay proper invoices, E&I has been seriously harmed.  It has been forced to lay off employees, sell assets to pay bills, invoke the protections of its performance bond and cease performing other contracts due to lack of working capital and the expense of pursuing its claims against WAPA. E&I also suffered a default judgment in the amount of $42,739.95 after Line Construction Benefit Fund filed a lawsuit against E&I for unpaid employee benefit contributions owed pursuant to a collective bargaining agreement between the IBEW Local Union 426 and E&I. Exhibit 23.  Because of WAPA's various failures to pay E&I, E&I could not afford to hire an attorney to respond to the lawsuit. WAPA's actions and failure to act have, as a practical matter, put E&I out of business. The harm caused by WAPA will be irreparable if WAPA does not pay E&I the amounts claimed herein, rescind E&I's termination for default, and negotiate a

termination for convenience settlement with respect to the five percent (5%) of the work that E&I did not complete.

## CAUSES OF ACTION

### COUNT I

**BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING**

38. The preceding allegations are incorporated herein as if set forth in full.

39. As the Court of Federal Claims said in *Peterson Industrial Depot, Inc. v. United States*:

The implied duty of good faith and fair dealing "imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005). 'The duty [of good faith and fair dealing] applies to the government just as it does to private parties." *Id.* The Federal Circuit has held that "a breach of the implied duty of good faith and fair dealing does not require a violation of an *express* provision in the contract." *Metcalf Const. Co., Inc. v. United States*, 742 F.3d 984, 994 (Fed. Cir. 2014) (emphasis in original). As such, the Federal Circuit has treated express duties and implied duties as separate obligations."

*Peterson Indus. Depot, Inc. v. United States*, No. 17-876C, 2018 WL 5118301, at *6 (Fed. Cl. Oct. 22, 2018).

40. In *Miller Elevator Co., Inc. v. U.S.* the Court of Claims said:

Under the implied duty of good faith and fair dealing, the Government maintains an implied duty to disclose information fundamental to the preparation of estimates or contract performance. JOHN CIBINIC, JR. & RALPH C. NASH, JR., ADMINISTRATION OF GOVERNMENT CONTRACTS 192 (2d ed. 1986). Nondisclosure of superior knowledge defines this implied duty. *GAF Corp. v. United States*, 932 F.2d 947, 949 (Fed.Cir.1991), *cert. denied*, 502 U.S. 1071, 112 S.Ct. 965, 117 L.Ed.2d 131 (1992); *Broad Ave. Laundry & Tailoring v. United States*, 231 Ct.Cl. 1, 9, 681 F.2d 746, 750 (1982); ***675** *Bauunternehmung v. United States*, 10 Cl.Ct. 672, 678 (1986), *aff'd*, 820 F.2d 1208 (Fed.Cir.1987). *See, e.g., Hardeman–Monier–Hutcherson v. United States*, 198 Ct.Cl. 472, 487, 458 F.2d 1364, 1371–72 (1972) ("It is well settled in this court that where the Government possesses special knowledge, not shared by the contractor, which is vital to the performance of the contract, the Government has an affirmative duty to disclose such knowledge. It cannot remain silent with impunity."); *Helene Curtis Indus., Inc. v. United States*, 160 Ct.Cl. 437, 444, 312 F.2d 774, 778 (1963) ("Although it

is not a fiduciary toward its contractors, the Government—where the balance of knowledge is so clearly on its side—can no more betray a contractor into a ruinous course of action by silence than by the written or spoken word."). If the Government fails this duty, the Government breaches the contract. *Pia v. United States,* 7 Cl.Ct. 208, 211 (1985), *aff'd,* 818 F.2d 876 (Fed.Cir.1987).

[4] This Court, as well as its predecessor courts, have long recognized the duty of disclosure of superior knowledge. *Oceanic S.S. Co. v. United States,* 218 Ct.Cl. 87, 120, 586 F.2d 774, 793 (1978); *Wm. T. Thompson & Co. v. United States,* 26 Cl.Ct. 17, 23 (1992); *Hercules, Inc. v. United States,* 25 Cl.Ct. 616, 621 (1992); *Granite Constr. Co. v. United States,* 24 Cl.Ct. 735, 750 (1991). Throughout these applications of this implied duty, the courts have established the following four prerequisites: (1) the Government possesses knowledge of vital facts regarding a solicitation or contract, (2) the contractor neither knows nor should have known of the facts, by contract specification or otherwise, (3) the Government knew or should have known of the contractor's ignorance of the facts, and (4) the Government failed to disclose the facts to the contractor. *Lopez v. A.C. & S., Inc.,* 858 F.2d 712, 717 (Fed.Cir.1988), *cert. denied,* 491 U.S. 904, 109 S.Ct. 3185, 3186, 105 L.Ed.2d 694 (1989); *Petrochem Servs., Inc. v. United States,* 837 F.2d 1076, 1079 (Fed.Cir.1988); *American Ship Bldg. Co. v. United States,* 228 Ct.Cl. 220, 228, 654 F.2d 75, 80 (1981); *Sterling Millwrights, Inc. v. United States,* 26 Cl.Ct. 49, 82 (1992).

*Miller Elevator Co., Inc. v. U.S.,* 30 Fed.Cl. 662, 674-675 (1994).

41.  The Court of Federal Claims continues to follow these holdings, as seen in *Canpro Investments Ltd. v. United States:* "The doctrine of superior knowledge 'imposes upon a contracting agency an implied duty to disclose to a contractor otherwise unavailable information regarding some novel matter affecting the contract that is vital to its performance.' *Giesler v. United States*, 232 F.3d 864, 876 (Fed. Cir. 2000), *quoted in Scott Timber Co. v. United States*, 692 F.3d 1365, 1373 (Fed. Cir. 2012); *accord AT&T Commc'ns, Inc. v. Perry*, 296 F.3d 1307, 1312 (Fed. Cir. 2002) ('[T]he government may breach a contract by withholding information when it has superior knowledge of that information and a duty to disclose it to the contractor.')." *Canpro Investments Ltd. v. United States*, 130 Fed. Cl. 320, 336, *reconsideration denied*, 131 Fed. Cl. 528 (2017).

42.  In this case the WAPA knew or should have known that Isolux had not paid its subcontractors in full, and that Isolux had not paid for and had not caused to be delivered to the jobsite several electrical equipment items that E&I had to incorporate into the VT Hanlon Substation per its prime contract with WAPA.  FAR § 49.101(d) required WAPA to perform an audit of the Isolux contract upon termination, and FAR §§ 49.105(b)(4) and (c)(8) require a termination inventory of government property.  Because WAPA paid Isolux in advance for electrical equipment purchases, and because Isolux had not installed this equipment in the substation prior to contract termination, these contractor-acquired property items became government property upon termination of Isolux's VT Hanlon Substation contract.  Upon award of the follow-on contract to E&I, these items became government-furnished property with respect to E&I.

43.  WAPA knew that some electrical equipment items that Isolux purportedly ordered were not present at the worksite. WAPA also knew that it had not caused an audit of Isolux's payments to suppliers and subcontractors and an inventory of contractor-acquired property to be performed following termination of the Isolux contract.  So WAPA had no idea whether Isolux had paid its subcontractors in full and had no idea what electrical equipment Isolux had ordered and paid for.  WAPA did not share this information with E&I prior to E&I's execution of the Completion Agreement, Tender Agreement and the Follow-On Contract.

44.  The Completion Agreement says that E&I shall not have to pay for any items ordered by Isolux prior to termination of its contract, so this information was of vital importance to E&I in agreeing to the contract amount and period of performance in the Follow-On Contract, and in its performance of the Follow-On Contract.  E&I did not know, nor should it have known that WAPA had not performed an audit or an inventory before executing the Completion and Tender

Agreements and the follow-on prime contract. WAPA padlocked the worksite structures following termination of the Isolux contract so E&I had no opportunity to determine what equipment was present on the worksite until after it executed the Agreements and follow-on contract, and it did not know and had no way of knowing what equipment WAPA had paid Isolux for or what orders were still in effect at supplier companies.  WAPA knew or should have known of E&I's ignorance of these facts and it did not tell E&I these facts. Pursuant to the FAR, WAPA had a duty to give E&I all information relevant to its proposed price for the Follow-On Contract.  Thus, WAPA breached the implied covenant of good faith and fair dealing. *See Miller Elevator Co., Inc. supra* at 675.  WAPA's actions and failures to act have destroyed E&I's reasonable expectations regarding the fruits of the contract.

## COUNT II

### FRAUDULENT INDUCEMENT

45.  The preceding allegations are incorporated herein as if set forth in full.

46.  The Completion Agreement has a "Governing Law, Jurisdiction and Venue" clause that says:

> This Agreement will be deemed to be a contract under the laws of the State of South Dakota and for all purposes will be governed by and construed and enforced in accordance with the laws of the State of South Dakota. The Parties to this Agreement consent to the jurisdiction of the State of South Dakota. Unless the jurisdictional prerequisites are not met, the Parties hereto irrevocably consent to the exclusive jurisdiction of the United States District Court for the District of South Dakota for the purpose of any litigation concerning this Agreement. In the event any such dispute involves Obligee [WAPA] or it is deemed necessary by either party to make Obligee a party with respect to the dispute and none of the forgoing courts have jurisdiction over Obligee, then any suit under this Agreement may be brought in such alternative court that has jurisdiction over Obligee.

> Exhibit 1 at Paragraph 24, page 16.

47.  To the extent that the Court must apply South Dakota law, the following case law is relevant:

> It appears that the Supreme Court of South Dakota has never directly addressed whether the economic loss rule bars recovery for negligent misrepresentation. The District Court for the District of South Dakota has allowed claims for fraud to go forward after finding that the economic loss rule applied to bar certain claims. Brookings Mun. Utilities, Inc. v. Amoco Chemical Co., 103 F.Supp.2d 1169, 1178 (D.S.D. 2000). The District Court has also held that "[o]n balance, the South Dakota Supreme Court seems more likely to hold that the economic loss doctrine does not bar fraud claims ...." Northwestern Public Service v. Union Carbide Corp., 115 F.Supp.2d 1164, 1170 (D.S.D. 2000). Including negligent misrepresentation as a species of fraud, I also hold that such misrepresentation claims should not be barred by the economic loss rule.  Indeed, *905 "[p]rior to the adoption of the economic loss rule, courts routinely awarded purely economic damages when a defendant's misrepresentation induced a transaction." Joseph Barton, *Drowning in a Sea of Contract: Application of the Economic Loss Rule to Fraud and Negligent Misrepresentation*, 41 Wm. & Mary L. Rev. 1789, 1802 (2000).
>
> *S. Dakota Wheat Growers Ass'n v. Chief Indus., Inc.*, 337 F. Supp. 3d 891, 904–05 (D.S.D. 2018).

48.  As the Court of Federal Claims said in *Canpro Investments Ltd. v. United States*, "The doctrine of superior knowledge 'imposes upon a contracting agency an implied duty to disclose to a contractor otherwise unavailable information regarding some novel matter affecting the contract that is vital to its performance.' *Giesler v. United States*, 232 F.3d 864, 876 (Fed. Cir. 2000), *quoted in Scott Timber Co. v. United States*, 692 F.3d 1365, 1373 (Fed. Cir. 2012); *accord AT&T Commc'ns, Inc. v. Perry*, 296 F.3d 1307, 1312 (Fed. Cir. 2002) ('[T]he government may breach a contract by withholding information when it has superior knowledge of that information and a duty to disclose it to the contractor.')." *Canpro Investments Ltd. v. United States*, 130 Fed. Cl. 320, 336, *reconsideration denied*, 131 Fed. Cl. 528 (2017).

49.  In this case, WAPA had superior knowledge that it did not share with E&I or Liberty Mutual.  WAPA knew that it had not audited Isolux' payments to subcontractors, and WAPA knew that it hadn't conducted a termination inventory of materials and equipment that was present at the jobsite and/or waiting at vendors' warehouses for delivery. FAR 49.402-3, Procedure for Default, (i) says: "In the case of a construction contract, promptly after issuance of the termination notice, the contracting officer shall determine the manner in which the work is to be completed and whether the materials, appliances, and plant that are on the site will be needed." This provision necessarily required an inventory of materials and equipment that were present at the jobsite at the time when WAPA terminated Isolux's contract.

50.  All evidence available to Plaintiffs indicates that WAPA paid no attention whatsoever to FAR 49.402-2, Effect of Termination for Default.  That section says:

> (a) *Under a termination for default, the Government is not liable for the contractor's costs on undelivered work and is entitled to the repayment of advance and progress payments, if any, applicable to that work*. [emphasis added] The Government may elect, under the Default clause, to require the contractor to transfer title and deliver to the Government completed supplies and manufacturing materials, as directed by the contracting officer.

> (b) The contracting officer shall not use the Default clause as authority to acquire any completed supplies or manufacturing materials unless it has been ascertained that the Government does not already have title under some other provision of the contract. *The contracting officer shall acquire manufacturing materials under the Default clause for furnishing to another contractor only after considering the difficulties the other contractor may have in using the materials.* [emphasis added]

> (c) Subject to paragraph (d) of this section, the Government shall pay the contractor the contract price for any completed supplies, and the amount agreed upon by the contracting officer and the contractor for any manufacturing materials, acquired by the Government under the Default clause.

(d) *The Government must be protected from overpayment that might result from failure to provide for the Government's potential liability to laborers and material suppliers for lien rights outstanding against the completed supplies or materials after the Government has paid the contractor for them. To accomplish this, before paying for supplies or materials, the contracting officer **shall take one or more of the following measures**:*

(1) *Ascertain whether the payment bonds, if any, furnished by the contractor are adequate to satisfy all lienors' claims or whether it is feasible to obtain similar bonds to cover outstanding liens.* [emphasis added]

(2) Require the contractor to furnish appropriate statements from laborers and material suppliers disclaiming any lien rights they may have to the supplies and materials.

(3) Obtain appropriate agreement by the Government, the contractor, and lienors ensuring release of the Government from any potential liability to the contractor or lienors.

(4) Withhold from the amount due for the supplies or materials any amount the contracting officer determines necessary to protect the Government's interest, but only if the measures in subparagraphs (d)(1), (2), and (3) of this section cannot be accomplished or are considered inadequate.

(5) Take other appropriate action considering the circumstances and the degree of the contractor's solvency.

(e) *The contractor is liable to the Government for any excess costs incurred in acquiring supplies and services similar to those terminated for default (see 49.402-6), and for any other damages, whether or not repurchase is effected (see 49.402-7).*

51.    As E&I was already performing as Isolux's subcontractor, WAPA and Isolux's bonding agents fraudulently induced E&I to assume the Prime Contractor's responsibility.  WAPA wrongfully and in bad faith used its superior knowledge and bargaining position to:

a.  Induce E&I to assume responsibility for performance and payment bonding via a Tender Agreement that was legally insufficient on its face because it lacked a material term; *i.e.* a signed and dated Completion Agreement;

b.  Induce E&I to sign a Completion Agreement based on its assurances regarding site conditions, and equipment and materials already in place, assurances that turned out to be false and misleading;

c.  Induce E&I to use the same subcontractors and suppliers that Isolux retained, without telling E&I that Isolux had not fully paid these subcontractors and suppliers;

d.  Induce E&I to bid on the Follow-On Contract based in part on a grossly incomplete set of drawings;

e.   Fail to consider E&I's responses to Requests for Information and failure to timely approve Change Orders requested by E&I after it commenced work, in violation of FAR 52.249-14 "Excusable Delays."

f.  Withhold properly-invoiced payments from E&I, making it difficult and eventually impossible for E&I to pay its subcontractors and suppliers, and to perform the work of the contract;

g.  Transmit to Plaintiffs a Show Cause letter that did not comply with the format and information specified in FAR § 49.607.

h. Terminated the Plaintiffs' contract for default in violation of FAR §§ 49.402-3 and 52.249-10.

52.  WAPA responded to E&I's concerns about missing equipment and other uncertainties and potential claims by saying "Any issues will be addressed as they come up."  However, WAPA did not resolve any of the issues and claims that E&I presented to the Contracting Officer.

53. E&I relied on WAPA's representations that it would address issues as they come up, to its detriment.

54. WAPA never had any intention of paying E&I for missing equipment, directed changes, and delays beyond the control of E&I and its subcontractors. Even after admitting in the February 22, 2018 project meeting that WAPA owed E&I money, the Contracting Officer still denied all of E&I's claims.

55. By its actions and failures to act, WAPA fraudulently induced E&I to enter into the Completion Agreement, the Tender Agreement and the Follow-On Contract, and E&I has suffered significant monetary damages as a result.

## COUNT III

### MISREPRESENTATION/CONCEALMENT

56. The preceding allegations are incorporated herein as if set forth in full.

57. Misrepresentation and/or concealment provides an additional cause of action based upon the same facts that support a claim of fraudulent inducement. The Court of Federal Claims said in the *Canpro* case:

> To prevail on a claim of misrepresentation, a Plaintiffs "must show that the Government made an erroneous representation of a material fact that the contractor honestly and reasonably relied on to the contractor's detriment." *AT&T Commc'ns*, 296 F.3d at 1312 (internal quotation marks omitted). A material misrepresentation is one that "would be likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so." *Id.* (internal quotation marks omitted). Unlike fraud, misrepresentation "does not require an intent to deceive." *First Interstate Bank of Billings v. United States*, 61 F.3d 876, 880 (Fed. Cir. 1995). It merely requires "an assertion that is not in accord with the facts." Restatement (Second) of Contracts, *supra*, at § 159, *quoted in Fed. Grp., Inc. v. United States*, 67 Fed.Cl. 87, 102 (2005). Although "intended to be truthful," an assertion "may be a misrepresentation because of ignorance or carelessness." Restatement (Second) of Contracts, *supra*, at § 159 cmt. a. Concealment is "an affirmative act intended or known to be likely to keep another from learning

of a fact of which he would otherwise have learned." *Id.* § 160 cmt. a. It is "always equivalent to a misrepresentation and has any effect that a misrepresentation would have." *Id.* at 343.

58.   Based upon the facts recited in Count II above, WAPA misrepresented the facts relating to missing equipment, amounts due to the Isolux subcontractors, directed changes, and delays when it said that these items would be resolved "as we go along." Either due to ignorance, carelessness or a deliberate concealment of facts, WAPA's misrepresentations induced E&I to enter into the Completion Agreement, the Tender Agreement, and the Follow-On Contract. As a result of WAPA's misrepresentations and concealment, E&I has suffered significant monetary damages.

## COUNT IV

## BREACH OF CONTRACT

59.   The preceding allegations are incorporated herein as if set forth in full.

In the *James M. Fogg Farms Inc.* case the Court of Claims recited the elements of a breach of contract claim as follows:

> To recover for a breach of contract, a party must plead and establish: (1) 'a valid contract between the parties;' (2) 'a duty arising out of the contract;' (3) 'a breach of that duty;' and (4) 'damages caused by that breach.' *BPLW Architects & Eng'rs, Inc v. United States*, 106 Fed.Cl. 521, 533 (2012) (*citing San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989))."
>
> *James M. Fogg Farms, Inc. v. United States*, 134 Fed. Cl. 363, 365–66 (2017).

60.   The Plaintiffs had valid contracts with WAPA, the Completion Agreement, the Tender Agreement, and the Follow-On Contract No. DE-WA0003661, VT Hanlon Substation, executed on April 13, 2017. WAPA had a variety of duties flowing from Plaintiffs' contracts, and it has

breached them. As a result of WAPA's breaches of its contractual duties the Plaintiffs has suffered significant monetary damages. Following are the duties that WAPA has breached:

    a. FAR 52.232-27 Prompt Payment for Construction Contracts (May 2014), failure to pay proper invoices received from Plaintiffs;

    b. FAR 52.242-14 Suspension of Work (Apr 1984), failure to modify the contract when WAPA's failure to make payments to the Plaintiffs within the time specified in the contract caused interruptions in the Plaintiffs' performance of the work, because Plaintiffs could not afford to pay its subcontractors and suppliers;

    c. FAR 52.243-4 Changes (Jun 2007), failure to grant change order requests submitted by Plaintiffs and failure to modify the contract price and schedule due to factors beyond the Plaintiffs' control and not caused by the fault or negligence of the Plaintiffs.

    d. FAR 52.249-10 Default (Fixed Price Construction) (Apr 1984), terminated Plaintiffs' contract for default in violation of FAR 52.249-10(b) and despite the fact that delays suffered by Plaintiffs were all beyond its control, without the fault or negligence of Plaintiffs, and largely, if not completely due to the failure of WAPA to fulfill its duties under the contract.

    e. Various provisions in FAR Part 49, Termination of Contracts.

    f. Various provisions in the Completion and Tender Agreements, including without limitation Paragraphs 5 and 6 of the Completion Agreement and Paragraph 2 of the Tender Agreement.

    61. WAPA must compensate E&I for the monetary damages that E&I has incurred as a result of WAPA's breaches of contract.

## COUNT V

## WRONGFUL CONTRACT TERMINATION

62. The preceding allegations are incorporated herein as if set forth in full.  The standards of review for default contract terminations are cited above in paragraphs 9 through 12.

63.  WAPA's termination of Plaintiffs' contract for default did not comply with the requirements of FAR § 49.402-3 Procedure for Defaults, and FAR § 52.249-10 – Default (Fixed-Price Construction). The WAPA letter that terminated the Plaintiffs' contract for default did not comply with the requirements of FAR § 49.402-3 "Procedure for Defaults," paragraph (f), as follows:

a. There is no reference to the terms of the contract and applicable laws and regulations;

b.  There is no consideration or citation as to a specific failure of the contractor or any consideration of the causes of the failure;

c. There is no consideration of the availability of supplies or services from other sources;

d.  There is no consideration of E&I's urgent need for subcontract services and vendor supplies or the time required for E&I to acquire them from other sources (as compared with the time delivery could be obtained from the delinquent subcontractors and suppliers);

e. There is no consideration of E&I's need for government contracts and the effect of a default termination on E&I's ability to win government-contract awards in the future;

f. There is no consideration of the effect of the termination on the ability of E&I to pay guaranteed loans, and progress payments or advance payments to subcontractors and suppliers; and,

g. The letter is devoid of any pertinent facts and circumstances.

64. As stated in the 2015 Contract Attorneys Deskbook:

The courts and boards recognize the common-law principles of **substantial compliance** (supply) and **substantial completion** (construction) to protect the contractor where timely performance departs in minor respects from that required by the contract.

If the contractor substantially complies with the contract, the government must give the contractor additional time to correct the defects prior to terminating for default. *Radiation Technology, Inc. v. United States*, 366 F.2d 1003 (Ct. Cl. 1966); *Al Khudhairy Grp.*, ASBCA No. 56131, 10-2 BCA ¶ 34,530 (even though 95% complete, the board held that because the termination affected only the uncompleted 5% of the work, the doctrine of substantial completion did not apply); *FD Constr. Co.*, ASBCA No. 41441, 91-2 BCA ¶ 23,983 (contractor not protected under doctrine of substantial completion because it abandoned the work and refused to complete administrative items); *Selpa Constr. & Rental Equip. Corp.*, PSBCA No. 5039, 11-1 BCA ¶ 34,635 (rejecting defense of substantial completion where contract was not complete after extensions totaling 563 days and building was not available for intended use).

2015 Contract Attorneys Deskbook, *supra* at Vol. 2, 25-4.

65.  E&I completed ninety-five percent (95%) of the work of the Follow-On Contract.

66. In an email from Doug Francil, WAPA Construction Control Representative to Mike Rens, E&I Site Supervisor dated April 6, 2018, Mr. Francil says: "Mike - here is the revised 'Remaining to be completed' list you asked for, as of today 4-6-18. Keep in mind this a work in progress list that was originally done for Bill Bindert and does not represent an *official* punch list for E&I." [emphasis added] This email certainly implies that the "Remaining to be Completed" list was an *unofficial* punch list, indicating that E&I substantially completed the work of the Follow-On Contract.

67.  In light of the fact that E&I substantially completed the work of the Follow-On Contract, and that all delays were the result of unforeseeable causes beyond the control and without the fault or negligence of E&I or its subcontractors, consistent with the *Radiation Technology, Inc.* and *Al Khudhairy Group* cases cited above, WAPA wrongfully terminated this contract for default.

## **CONCLUSION**

68.  In order to comply with FAR 49.402-2, Effect of Termination, the Contracting Officer would have had to contact Isolux's subcontractors and suppliers to determine what amounts Isolux had paid them, and what invoices and purchase orders were still in effect and awaiting payment. Contracting Officer Jonathan Dittmer said in the February 5, 2018 project meeting that "WAPA can't pay for something twice." However, if he had fully and timely complied with the FAR and taken action to survey the subcontractors and suppliers, and taken an inventory of materials and equipment available for the follow-on contractor, then WAPA would have known whether Isolux had been overpaid, what equipment Isolux had paid for and what purchase orders vendors had canceled, what subcontractors had not been paid in full by Isolux and the amounts due, if any, to each of the subcontractors. If WAPA had fully and timely complied with the FAR, then it could have recovered any overpayment from Isolux, or if Isolux couldn't repay it, then from the surety, Liberty Mutual. See FAR 49.402-6, 49.402-7, and FAR Subpart 32.6

69.  WAPA failed to issue any change orders or equitable adjustments due to directed changes, in particular relating to a large quantity of drawings issued to E&I after it had bid the Follow-On Contract.

70.  WAPA also failed to pay proper invoices that E&I submitted to the Contracting Officer.

71.  The Plaintiffs reserves its right to submit the evidence of Isolux false claims described in Paragraph 24 above to the Justice Department for possible prosecution.

———————————————

**RELIEF SOUGHT**

WHEREFORE, E&I respectfully requests that this Court:

A.    Find that WAPA's default termination of E&I's contract was unreasonable, arbitrary and capricious, an abuse of discretion, otherwise not in accordance with laws and regulations, and without observance of procedures required by law, including without limitation the requirement that the contracting officer account for the contractor's excusable delay;

B.    Find that E&I's failure to complete contract performance by the contract completion date was excusable due to unforeseeable causes beyond the control and without the fault or negligence of E&I and its subcontractors;

C.    Enter judgment against the United States in the amount of $3,605,289.80, including without limitation all attorneys' fees and costs to date plus the fees and costs of prosecuting this case, per paragraph 17 of the Completion Agreement.

D.    Order WAPA to rescind the termination for default;

E.    Order WAPA to negotiate with E&I a termination for convenience settlement of the remaining 5% of the Follow-On Contract in accordance with FAR § 52.249-2; and

F.    Any other monetary and injunctive relief that the Court deems appropriate.

February 12, 2019

                                   Respectfully submitted,

                                  *s/Wayne N. White Jr.*
                                  Wayne N. White Jr.
                                  Whitcomb, Selinsky, McAuliffe, PC
                                  2000 S. Colorado Blvd. Tower One
                                  Suite 9500
                                  Denver, CO 80222
                                  (303)534-1958 office (720) 550-7232 direct
                                  (303)534-1949 fax

_/s Daniel McAuliffe_____
Daniel McAuliffe
Whitcomb, Selinsky, McAuliffe, PC