# In the United States Court of Federal Claims

No. 19-244C
Filed: April 15, 2021

**E&I GLOBAL ENERGY SERVICES, INC., et al.,**

    *Plaintiffs*,

v.

**THE UNITED STATES,**

    *Defendant.*

*Joseph Whitcomb*, Whitcomb, Selinsky, P.C., Denver, CO, for Plaintiff.

*Christopher L. Harlow*, Trial Attorney, *Patricia M. McCarthy*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., with whom were *Thomas Cardova*, and *Trevor Upderaff*, Western Area Power Association, Denver, CO, of counsel, for Defendant.

## MEMORANDUM OPINION AND ORDER

**TAPP, Judge.**

  This case concerns a contract dispute stemming from the construction of a high voltage substation in South Dakota. Plaintiffs, E&I Global Energy Services, Inc. and E&C Global, LLC (collectively "E&I"), seek damages for breach of contract and injunctive relief to convert a termination for default into a termination for convenience. (Compl. at ¶ 36, ECF No. 1).

  Before the Court are several motions seeking overlapping relief. The United States moves for partial summary judgment on E&I's wrongful termination and breach of contract claims for all but one category of invoices. (Def.'s MPSJ, ECF No. 42). E&I also moves for partial summary judgment on its wrongful termination claim, seeking a declaratory judgment that the United States' termination for default was improper together with an order converting it to a termination for convenience. (Pl.'s MPSJ, ECF No. 50). In responding to E&I's Motion, the United States cross-moves for judgment on the pleadings with respect to E&I's wrongful termination claim. (Def.'s MJP, ECF No. 53). Each motion is ripe for decision.

  For the following reasons, the United States' Motion for Partial Summary Judgment is **GRANTED-IN-PART** and **DENIED-IN-PART**. E&I's Motion for Partial Summary Judgment is **DENIED**. Finally, the United States' Motion for Judgment on the Pleadings is **GRANTED**.

I.      Background

In September 2015, the United States, acting through the U.S. Department of Energy's Western Area Power Association ("WAPA"), awarded Isolux Corsan, LLC ("Isolux") a contract to "provide all labor, materials, equipment, transportation and other resources to complete the construction of a new high voltage VT Hanlon Substation in South Dakota." (Compl. Ex. 4). WAPA estimated the cost of construction between $5,000,000 and $10,000,000 and all work was to be completed within 545 days of the Notice to Proceed. (*Id.*).

Liberty Mutual Insurance Company and The Insurance Company of the State of Pennsylvania (collectively "the Sureties") issued performance and payment bonds on behalf of Isolux. (*See* Tender Agreement, Compl. Ex. 2 at 1). These bonds guaranteed completion of the construction project. (*Id.*) In December 2016, WAPA terminated Isolux for defaulting on its performance obligations. (Compl. ¶ 15). That same month, WAPA and E&I—a subcontractor on the project—discussed E&I becoming the prime contractor on the project. (*Id.* ¶ 16).

Several months later, in March 2017, the Sureties entered into a Completion Agreement with E&I to take over the project. (*See* Completion Agreement, Compl. Ex. 1). E&I would satisfy the performance obligations of the Sureties' bonds and complete construction of the substation for a fixed price of $5,428,625.69. (*Id.* at 2–3). This "Completion Price" was described as:

> "[A]ll-inclusive," consisting of all subcontractor and vendor costs, the costs of repair, *replacement and/or correction of any Defects*, the costs of addressing any warranty claims, the costs of general conditions work and services by Completion Contract, including its site labor force, the costs for Completion Contractor's project staff, and all other direct and indirect costs of performance under this Agreement, including any and all insurance and/or bond premiums.

(*Id.* at 2 (emphasis added)). "Defects" was defined to include:

> All defects resulting from work previously performed by or on behalf of [Isolux] and any other claims arising out of work that [Isolux] performed or should have performed under the Bonded Contract, *regardless of whether [E&I] was aware or unaware of said defect prior to execution of this Agreement*. The term "Defect" included any defect in the work performed by [E&I] during the Completion of the Project.

(*Id.* (emphasis added)). Section 2 of the Completion Agreement made clear that:

> [E&I] assumes all responsibility and liability for correction, repair, and/or replacement of any Defects and expressly acknowledges that *the Completion Price includes consideration for correction of any Defects*.

(*Id.* § 2 (emphasis added)). Significantly, E&I expressly warranted that it had inspected and examined the status of the project and the relevant contractual agreements and disclaimed any reliance on representations from the Sureties or WAPA:

2

> [E&I] has: (i) examined the Bonded Contract together with all amendments or addenda; (ii) visually investigated the status of and the conditions affecting the Work (including, but not limited to, the locality and Project site); and (iii) fully informed itself with respect to those items required to complete the Work and perform all of the obligations required hereunder *independent of any representations or warranties, either express or implied, of Sureties, [WAPA], or any of their respective employees, agents, consultants, or representatives.*

(Completion Agreement § 14 (emphasis added)).

After E&I and the Sureties executed the Completion Agreement, the Sureties then tendered E&I to WAPA as the new prime contractor. (Tender Agreement at 1). Most of the Completion Agreement became part of the Tender Agreement by reference. (*Id*. at 1–2). However, the Tender Agreement provided that "Sections 3 and 16 of the Completion agreement shall survive this tender of [E&I], such that the benefits and obligations of Sections 3 and 16 of the Completion Agreement shall remain with and continue to run to Sureties and shall not pass to [E&I], regardless of anything provided for in this Agreement." (*Id*. § 2). Section 3 of the Completion Agreement allowed for E&I to perform grading work that may or may not have been within the original scope of work delineated in the payment and performance bonds. (Completion Agreement § 3). Section 16 provided that E&I would "not be responsible for paying sums due [to] any of [Isolux's] subcontractors or vendors with respect to materials ordered and/or work performed on behalf of [Isolux] prior to the date of this Agreement." (*Id.* § 16).

The Tender Agreement contained a merger clause, clarifying that the Tender Agreement represented the entire agreement and incorporated all "oral discussions and prior agreements" among the parties. (Tender Agreement § 9). Of course, as mentioned above, Sections 3 and 16 of the Completion Agreement survived the tender. (*Id*. § 2).

In turn, in April 2017, E&I signed a Follow-On Contract with WAPA which incorporated the Tender Agreement (and thus most of the Completion Agreement) in its entirety. (Follow-On Contract, Compl. Ex. 3).[1] E&I agreed to complete the project within 330 days of the Notice to Proceed. (*Id*. at 1). The Follow-On Contract included standard government contract language. The Contracting Officer, Jonathan Dittmer, became the sole authorized representative of the United States who could assign additional work, issue changes, alter the terms or price, accept non-conforming work, or waive any requirement of the contract. (*Id*. at 8). The Follow-On Contract incorporated the standard changes clause, FAR § 52.243-4, which required E&I to notify WAPA in writing within 20 days of performing any work pursuant to a change order from the Contracting Officer. (*Id*. at 28).

---

[1] Because the Follow-On Contract, Contract No. DE-WA0003661, incorporates the other two agreements by reference, the Court will refer to the three documents collectively as "the Contract."

3

On May 8, 2017, WAPA provided E&I with a conditional Notice to Proceed with "completion of the control building and erection of steel on site." (DA001).[2] This conditional notice initiated the 330-day countdown for E&I's completion of the project. Several months later, on September 12, 2017, WAPA provided E&I with a formal Notice to Proceed. (DA002). E&I's complete performance was due April 3, 2018. (*Id.*).

Three days after the completion deadline, on April 6, 2018, WAPA sent E&I a Show Cause Notice noting E&I's failure to perform under the deadline. (Show Cause Notice, Compl. Ex. 12). In that Notice, WAPA informed E&I that it was considering termination of the contract for default. (*Id.*). WAPA further observed that it appeared E&I had "effectively abandoned work under the project[,]" noting that E&I had "dramatically reduced the number of workers on site, removed all required equipment necessary to complete the project, and removed the office trailers which [E&I was] required to provide." (*Id.*). The letter also recounted E&I's "demand for over $700,000 in purported change orders" submitted in February 2018. (*Id.*).

On May 18, 2018, WAPA terminated E&I for default, citing E&I's failure to complete the project within the time specified in the contract. (Notice of Termination, Compl. Ex. 14). In October 2018, E&I submitted a certified Contracts Dispute Act ("CDA") claim for $3,336,932.79. (Compl. Ex. 15). The Contracting Officer denied that claim. (Compl. Ex. 16). This lawsuit followed shortly thereafter.

E&I's Complaint itemized the damages sought as follows:

> 1. Invoiced amounts owed to E&I for supplies purchased by E&I and for services provided by E&I on the VT Hanlon Substation. E&I has itemized these costs by contract [line item numbers] as of April 13, 2017. These amounts were invoiced, but not paid. The amount of money invoiced per CLIN that WAPA has not paid is $284,110.88. Exhibit 17. The Contracting Officer also verbally agreed to pay another $74,140.01. Exhibit 18. The total claim amount for this category is $358,250.89.
>
> 2. Amount owed for supplies and services pursuant to change order requests submitted to WAPA, but never approved or paid. The amount of money WAPA owes E&I pursuant to its requested change orders is $1,257,986.44. Exhibit 19.
>
> 3. Amount owed to E&I for assuming WAPA's obligations based on false assurances and representations of the amount of work that Isolux completed, supplies that Isolux purchased that were supposedly available at the worksite, plus equipment that was supposed to be at the worksite or in a vendor warehouse ready to ship, but was not there. The amount of money WAPA owes E&I in this category is $ 1,712,132.23. Exhibit 20.

---

[2] With its Motion for Partial Summary Judgment, the United States filed an appendix containing relevant documents. (Def.'s App'x, ECF No. 42-1). The Court will refer to this appendix as "DA__."

      4. Amount owed to E&I resulting from WAPA's breaches of contract and E&I's resulting reliance on its bonds. The amount of money that WAPA owes to E&I for these breaches is $209,811.24. Exhibit 21.

      5. Amount owed to E&I for preparing and submitting this complaint and earlier claims presented to WAPA. The amount of money WAPA owes E&I for this expense is $67,109.00. Exhibit 22.

      6. E&I's request that WAPA rescind the Termination for Default.

(Compl. ¶ 36).

      The Court has issued two significant Opinions in this case. Judge Bruggink's Opinion dismissed the third category of damages and the three counts supporting it under RCFC 12(b)(6) for failure to state a claim upon which relief could be granted. *E & I Glob. Energy Servs., Inc. v. United States*, 144 Fed. Cl. 508 (2019) (docketed at ECF No. 16) (hereinafter "*E&I Glob. Energy Servs. I*"). The most recent Opinion, *E&I Glob. Energy Servs., Inc. v. United States*, __ Fed. Cl. __, 2021 WL 670437 (Fed. Cl. Feb. 22, 2021) (docketed at ECF No. 57) (hereinafter "*E&I Glob. Energy Servs. II*"), denied two motions for reconsideration attempting to revive those dismissed counts and obtain related discovery. That decision also detailed the extensive procedural history of this case which there is no need to recite here.

      All that remains of E&I's Complaint is one count of breach of contract (Count IV) and one count of wrongful termination (Count V). Essentially, E&I's remaining claims allege that (1) WAPA breached the Contract by denying certain invoices; and (2) the denial of those invoices renders E&I's default termination improper and conversion to termination for convenience is therefore warranted.

## II. Analysis

      The United States seeks partial summary judgment on E&I's breach of contract claims, which E&I itemized in Paragraph 36 of its Complaint. First, the United States contends that the parties have agreed that some of the claims in Paragraph 36(1) are erroneously duplicative and that some factual issues remain. (Def.'s MPSJ at 6–8). The United States also seeks summary judgment on many of the invoices that comprise the other claims within Paragraph 36. (*Id*. at 8–15). While the United States' arguments are compelling, the Court finds that the United States is entitled to some, but not all, of the relief it seeks with respect to E&I's breach of contract claims.

      Additionally, in its Response to E&I's Motion for Partial Summary Judgment on the wrongful termination Count, the United States also moves for Judgment on the Pleadings. In that Motion, the United States persuasively argues that E&I's arguments in support of partial summary judgment are self-defeating, and additionally, that the Court has previously rejected E&I's misrepresentation claims. (Def.'s MJP at 4, 8). Accordingly, for the reasons explained below, the United States is entitled to judgment on Count V, the wrongful termination claim.

> A.  *Paragraph 36(1) presents an issue of genuinely disputed material fact.*

In E&I's Complaint, Paragraph 36(1), E&I seeks $358,250.89 for "amounts owed to E&I for supplies . . . and services provided by E&I[.]" (Compl. ¶ 36(1)). The United States contends that some of the claims in Paragraph 36(1) are erroneously duplicative or the product of arithmetic error, and that after correction, only $177,810.88 remains in dispute. (Def.'s MPSJ at 20). The United States further alleges that liability for that sum remains contingent on resolution of disputed material facts. Specifically, the United States asserts that the parties continue to dispute whether work was performed for contract line item numbers 2, 30, 32, 40, 41, 46, 47, and 48. (Def.'s MPSJ at 7–8).

E&I concedes that the two exhibits detailing damages—Exhibits 17 & 18—are erroneously duplicative. (Pl.'s Opp. at 17, ECF No. 46). However, E&I's concession is limited to dismissal of those duplicative claims, reducing the claims in Paragraph 36(1) by $74,140.01. (*Id*.). The United States does not explain the nature of the alleged arithmetic error, nor does it detail how it would affect the total damages calculation. Thus, the Court cannot grant full relief. Accordingly, considering the limits of the agreement of the parties, the United States is entitled to summary judgment with respect to the duplicative claims totaling $74,140.01.

> B.  *Some of the claims in Paragraph 36(2) are either precluded by the plain language of the Contract, or unsupported by admissible evidence.*

E&I's Complaint, Paragraph 36(2), asserts that E&I is owed $1,257,986.44 for "supplies and services pursuant to change order requests submitted to WAPA, but never approved or paid." (Compl. ¶ 36(2)). E&I argues that WAPA breached the Contract by denying invoices E&I submitted. (Compl. ¶ 59–61). E&I lists these invoices in its Complaint, Exhibit 19.

The United States moves for summary judgment on the majority of the invoices that make up Paragraph 36(2) (and listed in Exhibit 19), contending that many of these invoices are precluded by the plain language of the contract. (Def.'s MPSJ at 8–15). The United States attacks these invoices with a trifecta of arguments. First, the United States contends that E&I's recovery on Invoice Nos. 1378, 1379, 1381, 1410, and 1411 is precluded by the all-inclusive firm-fixed price term of the Contract. (*Id*. at 9–12 (citing the fixed price term of the Completion Agreement)). Second, the United States asserts it is entitled to summary judgment on nine invoices[3] because these invoices seek additional compensation for work solicited through amendments and addenda to the original solicitation, which predated E&I's takeover, were incorporated into the Contract, and were contemplated in the fixed price term. (*Id*. at 12–14). Third, the United States seeks summary judgment on sixteen invoices[4] for change orders based on E&I's failure to comply with the Contract's changes clause notice requirements. (*Id*. at 14–

---

[3] Invoice Nos. 1346, 1383, 1386, 1388, 1389, 1390, 1391, 1420, and 1422. (Def.'s MPSJ at 12–14).

[4] These invoices are Invoice Nos. 1033, 1034, 1040, 1041, 1042, 1275, 1276, 1278, 1280, 1387, 1395, 1404, 1408, 1413, 1414, and 1419. (Def.'s MPSJ at 14 n. 7).

15). The United States further identifies a separate set of seven invoices[5] which it contends are unsupported by documentation, and on that basis, the United States is entitled to summary judgment on E&I's related claims. (Def.'s MPSJ at 7, 15).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). A "genuine dispute" exists where a reasonable factfinder "could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those which might significantly alter the outcome of the case; factual disputes which are not outcome-determinative will not preclude summary judgment. *Id.*

Whether any or all of these invoices are precluded by the terms of the Contract is primarily an issue of contract interpretation—a question of law particularly suited for summary judgment. *Lucent Techs., Inc. v. Gateway, Inc.*, 543 F.3d 710, 717 (Fed. Cir. 2008); *Varilease Tech. Group, Inc. v. United States*, 289 F.3d 795, 798 (Fed. Cir. 2002) (citing *Textron Def. Sys. v. Widnall*, 143 F.3d 1465, 1468 (Fed. Cir. 1998)). Contract interpretation begins with the plain language of the terms of the agreement, giving the words their ordinary meaning. *Jowett, Inc. v. United States*, 234 F.3d 1365, 1368 (Fed. Cir. 2000).

The United States also argues that many of these invoices are unsupported by documentation showing entitlement to relief. (Def.'s MPSJ at 15). "When a motion for summary judgment is properly supported by documentary and testimonial evidence . . . the nonmoving party may not rest upon mere allegations or denials of his pleadings, but rather must present significant probative evidence to establish a genuine issue of material fact." *Clearwater Systems Corp. v. Evapco, Inc.*, 394 F. App'x 699, 704 (Fed. Cir. 2010); *Rotec Industries, Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1256 (Fed. Cir. 2000) ("It is well settled that a party opposing a motion for summary judgment must rely on competent evidence of a type otherwise admissible at trial."). "In rendering a decision on a motion for summary judgment, a court must 'view the evidence presented through the prism of the substantive evidentiary burden' that would inhere at trial." *Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH*, 139 F.3d 877, 880–81 (Fed. Cir. 1998) (quoting *Anderson*, 477 U.S. at 254).

### i. The "all-inclusive" Completion Price term saddled E&I with the performance risks for which it seeks additional compensation.

The United States argues that the Contract provided a fixed price for E&I's performance and that several of E&I's claims contained in its Complaint, Paragraph 36(2), seek additional compensation for costs that fell within the scope of that fixed price term. (Def.'s MPSJ at 8–12). Because the fixed price term already includes compensation for the work delineated in Invoice Nos. 1378, 1379, 1381, 1410, and 1411, the United States submits that E&I's breach of contract claim must fail to the extent it relies on denial of those invoices. (*Id.*).

---

[5] Invoice Nos. 1039, 1277, 1357, 1384, 1385, 1421, 1423. (Def.'s MPSJ at 7, 15).

The Contract's fixed price term provided that:

> "Completion Price" means [$5,428,625.69]. Other than the Exclusions, the Completion Price is "all-inclusive," consisting of *all subcontractor and vendor costs*, the costs of *repair, replacement and/or correction of any Defects*, the costs of addressing any warranty claims, the costs of general conditions work and services by [E&I], including its *site labor force*, the costs for [E&I's] *project staff*, and *all other direct and indirect costs of performance* under this Agreement, including any and all insurance and/or *bond premiums*.

(Completion Agreement at 2 (emphasis added)). This provision is dispositive. A fixed-price term places the risk of loss for underbidding or misjudging the costs of performance on the contractor. FAR § 16.202-1; *Widnall*, 132 F.3d at 1451.

Invoice 1378 requests $130,175.05 for "[p]rovid[ing] additional gravel to meet drawing specs[.]" (Compl. Ex. 19 at 1; DA128). Dakota Constructors, Inc. ("DCI"), an E&I subcontractor, purchased this gravel and billed the costs to E&I. (DA129). E&I then billed the Sureties, noting "Liberty Mutual had $100,000 in bond to capture any further civil costs by DCI. Site required additional gravel to meet civil specs on drawings." (DA128). As discussed above, the Contract's Completion Price was inclusive of "all subcontractor and vendor costs[.]" (Completion Agreement at 2). E&I clearly acknowledged that the Sureties were responsible for these cost overruns, not WAPA. In fact, Invoice 1378 itself is addressed to Liberty Mutual, one of the Sureties. (DA128). Invoice 1378 seeks compensation for payment of subcontractor costs and is therefore precluded by the plain language of the Contract and its denial cannot form the basis of a breach of contract claim.

Invoice No. 1379 requests $645,936.69 for "[o]vertime to meet WAPA requirements[.]" (Compl. Ex. 19 at 2; DA130). Invoice No. 1381 requests $29,067.15 simply for "[o]vertime[.]" (Compl. Ex. 19 at 2; DA131). The invoices stated that the overtime was "[t]o meet schedule demands required by [WAPA]." (DA130–31). The Completion Price was inclusive of "the costs of general conditions work and services by [E&I], including its site *labor force*, the costs for [E&I's] *project staff*, and all other direct and indirect costs of performance[.]" (Completion Agreement at 2 (emphasis added)). These labor costs were included in the fixed price term, which saddled E&I with the risk of loss for underbidding or misjudging performance costs. *See Widnall*, 132 F.3d at 1451; FAR § 16.202-1. Invoice Nos. 1379 & 1381 seek compensation for the labor force and project staffing costs. E&I is precluded from seeking additional compensation for these costs under the fixed price term, and therefore WAPA's denial of those invoices cannot form the basis for a breach of contract claim.

Invoice No. 1410 requests $70,952.49 in additional compensation related to an increase in bond premiums for the project. (Compl. Ex 19 at 2; DA282, 190, 353). As noted above, "bond premiums" were part of the all-inclusive Completion Price term of the Contract. (Completion Agreement at 2). On April 20, 2018, E&I sent WAPA a letter in response to WAPA's show cause notice. (DA279–283). In that response, E&I acknowledged that "[u]pon subsequent review of the Completion Agreement, E&I understands that [it] is responsible for this bond premium." (DA282). In an RCFC 30(b)(6) deposition of E&I's President Jeffrey Bruce, E&I confirmed it

8

was responsible for the increased bond premiums. (DA348, 355). Invoice 1410 is precluded by the plain language of the fixed price term, a fact E&I has previously acknowledged, and thus WAPA's denial of that invoice cannot form the basis of a breach of contract claim.

Invoice No. 1411 requests $84,836.43 for "[s]witch rotation and offset repair/rebuild." (Compl. Ex. 19 at 2; DA191). In contemporaneous email correspondence, E&I and one of its subcontractors described an issue with breaker switches facing the wrong direction, posing engineering challenges. (DA192–95, 196). The subcontractor explained that it was trying to "recover some of the [costs of] labor used to change the switches around so they would operate[,]" and also noted that "at no time did we get an updated approval from WAPA" regarding the changes. (DA192). The subcontractor further stated that "this was [an] Isolux issue" and that it had "produced switches without hearing from the customer[.]" (DA192). As noted above, the Contract's Completion Price was inclusive of "all subcontractor and vendor costs[.]" (Completion Agreement at 2). Additionally, the Completion Price included the costs of "repair, replacement and/or correction of any Defects" arising out of work that Isolux performed or should have performed under the Contract. (*Id.*). Invoice No. 1411 seeks compensation for payment of subcontractor costs, Defects in Isolux's performance, or both, and is therefore precluded by the plain language of the Contract. Its denial cannot form the basis of a breach of contract claim.

In Response to the United States' arguments, E&I fails to grapple with the plain language of the Contract but instead, makes arguments the Court has previously rejected and/or that now contradict its prior allegations and representations. In its Response to the United States' Motion, E&I first counters that it was fraudulently induced to enter into the Contract—particularly the fixed-price clause—through misrepresentations by WAPA and Contracting Officer Jonathan Dittmer, and therefore the Court should render that clause "null and void." (Pl.'s Opp. at 3–4). Second, E&I points to several instances where WAPA allegedly violated provisions of the FAR in its dealings and termination of Isolux and urges the Court to "declare that the contract itself was illegal and/or otherwise nullified." (*Id*. at 5–7). Third, E&I vaguely alleges that there are disputed factual issues that preclude summary judgment. (*Id*. at 8, 10).

E&I's first argument, which relies on misrepresentation, was rejected in both *E&I Glob. Energy Servs. I*, 144 Fed. Cl. at 515 (finding that E&I had demonstrated a "clear understanding of the contract" which prevented it "from establishing a necessary element of its [misrepresentation] claim—that the contract documents were misleading."), <u>and</u> *E&I Glob. Energy Servs. II*.; *E&I Glob. Energy Servs. II*, 2021 WL 670437 at *9–10 (reiterating that by E&I's own admission, it was incapable of being misled). Additionally, E&I's novel argument that the contract is "null and void" is at odds with E&I's Complaint. (Compl. ¶ 60 (alleging E&I "had valid contracts with WAPA, the Completion Agreement, the Tender Agreement, and the Follow-On Contract No. DE-WA0003661, VT Hanlon Substation, executed on April 13, 2017.")). It also contradicts representations E&I *repeatedly* made during discovery. (*See, e.g.*, DSA057 (same as Compl. ¶ 60), 058 (same), 059 (same), 060 (same), 061 (same), & 063

9

(same)).[6] Furthermore, the Contract's merger clause precludes any reliance on prior statements, "oral discussions and prior agreements" among the parties. (Tender Agreement § 9). Any reliance on misrepresentation is doomed by the terms of the Contract and E&I's admitted understanding of those terms.

E&I's second argument was also addressed previously in *E&I Glob. Energy Servs. I*. There, in opposing the United States' Motion to Dismiss, E&I argued that the contracting officer "failed to promptly complete audit reviews of the Isolux contract pursuant to 48 C.F.R. § 49.101(d) of the Federal Acquisition Regulations ("FAR") and failed to perform certain duties regarding termination inventory pursuant to FAR 49.105(b)(4), (c)(8)." *E & I Glob. Energy Servs. I*, 144 Fed. Cl. at 514. The Court plainly rejected that argument, holding that "[t]he government's rights and obligations under the termination clauses related to Isolux and do not run to E & I's benefit." *Id*.; (*see also* Tender Agreement § 2). The Court made clear that with respect to the audit review and termination inventory, "the government is under no obligation to engage in an exercise of self-criticism prior to securing a follow-on contractor." *Id*. Besides, by the terms of the Completion Agreement, E&I waived any reliance on government audits and reviews in submitting its bid:

> [E&I] has: (i) examined the Bonded Contract together with all amendments or addenda; (ii) visually investigated the status of and the conditions affecting the Work (including, but not limited to, the locality and Project site); and (iii) fully informed itself with respect to those items required to complete the Work and perform all of the obligations required hereunder *independent of any representations or warranties, either express or implied, of Sureties, [WAPA], or any of their respective employees, agents, consultants, or representatives*.

(Completion Agreement § 14 (emphasis added)).

Lastly, E&I's assertion that issues of disputed fact remain with respect to these invoices is without merit. E&I does not dispute the accuracy of its internal documents contained in Defendant's Appendix or the terms of the Contract. Instead, it asserts there are disputed factual issues surrounding its misrepresentation and fraudulent inducement claims. However, as discussed above, these claims fail, cannot form the basis of a breach of contract claim, and do not support E&I's quest to invalidate a contract it has repeatedly conceded is valid. Therefore, any issues of fact related to those claims are not "material" and, consequently, do not preclude summary judgment. RCFC 56(a); *Anderson*, 477 U.S. at 248 ("Factual disputes that are irrelevant or unnecessary will not" preclude summary judgment).

E&I's breach of contract claims with respect to Invoice Nos. 1378, 1379, 1381, 1410, and 1411 are precluded by the plain language of the Contract as well as E&I's own acknowledgment

---

[6] The United States filed a supplemental appendix with its Reply in support of its Motion for Partial Summary Judgment. (Def.'s Supp. Appx., ECF No. 56-1). The Court refers to this supplemental appendix as "DSA__."

of the meaning of those terms. Accordingly, the United States is entitled to summary judgment with respect to Invoice Nos. 1378, 1379, 1381, 1410, and 1411.

> ii. E&I agreed to design and specification amendments that predated its promotion to prime contractor and were included in the fixed price term.

The United States asserts it is entitled to summary judgment on nine invoices—Invoice Nos. 1346, 1383, 1386, 1388, 1389, 1390, 1391, 1420, and 1422—because these invoices seek additional compensation for work solicited through amendments and addenda to the original solicitation, which predated E&I's takeover, were incorporated into the Contract and were contemplated in the fixed price term. (Def.'s MPSJ at 6, 12–14). The United States argues that those nine invoices pertain to design and specification changes made to either the Solicitation or Isolux's contract before E&I was tendered as the prime contractor. (*Id.*).

The United States argues that five of the nine invoices—Invoice Nos. 1383, 1386, 1388, 1389, and 1390—pertain to design and specification changes made to Isolux's contract before E&I contracted with WAPA. (DA132–49, 152–80). In Paragraph 14 of the Completion Agreement, E&I warranted that it had:

> (i) examined the Bonded Contract *together with all amendments or addenda*; (ii) visually investigated the status of and the conditions affecting the Work (including, but not limited to, the locality and Project site); and (iii) *fully informed itself with respect to those items required to complete the Work and perform all of the obligations required hereunder* independent of any representations or warranties, either express or implied, of Sureties, [WAPA], or any of their respective employees, agents, consultants, or representatives.

(Completion Agreement § 14 (emphasis added)). On August 8, 2016, WAPA transmitted a set of revised drawings to Isolux via email. (DA267–68; 265). In this email, the drawings are identified by "VH" and a number, with a short description of the change. (*Id.*). In a March 23, 2017 email, prior to the execution of the Tender Agreement, WAPA sent E&I several revised drawings, each titled "VTH Revised Drawing Transmittal" and numbered 4–9. (DA258). E&I later recirculated this email internally, evincing its receipt. (*Id.*). On July 20, 2017, WAPA emailed E&I two updated drawings, Transmittal Nos. 6 & 7, which "were previously sent to Isolux Corsan [in 2016]," but for which WAPA never received requests for proposals. (DA139).

According to the terms of the Completion Agreement, E&I warranted that it had examined "all amendments [and] addenda" and had "informed itself with respect to those items required to complete" the project. (Completion Agreement § 14). Based on that representation, WAPA accepted the Sureties' tender of E&I as the completion contractor under the all-inclusive fixed price term. (Tender Agreement at 1 ("[E&I] agrees to complete the work under the Bonded Contract in accordance with the provisions of the Completion Agreement[.]")). Therefore, E&I had a contractual responsibility to make itself aware of these amendments to the Isolux contract prior to bidding and cannot maintain a breach of contract claim based on WAPA's denial of any invoices for work which was previously incorporated as an amendment to Isolux's contract. The United States contends that Invoice Nos. 1383, 1386, 1388, 1389, and 1390 seek to do just that. (DA132–49, 152–80).

Invoice No. 1383 references Transmittal #5, and seeks $2,207.89 for "[c]ost of materials for sign revisions[.]" (Compl. Ex. 19). On August 3, 2016, WAPA emailed Isolux updated specifications for "Drawing Transmittal #5." (DA265). As evidenced, Isolux received this amendment prior to E&I's takeover. (*Id.*). E&I was responsible for reviewing Isolux's contract and its amendments, and indicated it had done so when signing the Completion Agreement. (Completion Agreement § 14). Because Invoice No. 1383 pertains to design specifications and changes that predate E&I's takeover of the prime contract, denial of that invoice cannot form the basis of a breach of contract claim and the United States is entitled to summary judgment.

Several invoices pertain to drawings labeled with "VH" numbers and were provided to Isolux prior to E&I's takeover of the project. Invoice No. 1386 references a drawing identified as "VH 1125," and seeks $2,051.65 for "Switch from Bus to Jumpers[.]" (Compl. Ex. 19; DA139). On August 8, 2016, WAPA emailed Isolux drawing revisions, including a revision to the drawing titled "VH 1125." (DA267). Invoice No. 1388 references drawings identified as "VH 1600, VH 1602, VH 1604, and VH 1606," and seeks $12,355.98 for wire size changes. (Compl. Ex. 19 at 2; DA152). On August 8, 2016, WAPA emailed Isolux various revisions, including revisions to the drawings titled "VH 1600, Rev. A," "VH 1602," "VH 1604" and "VH 1606." (DA267). Invoice No. 1389 references drawings identified as "VH 1612, 1614, and 1616," and also seeks $4,851.06 for wire size changes. (Compl. Ex. 19 at 2; DA164). On August 8, 2016, WAPA emailed Isolux various revisions, including revisions to the drawings titled "VH 1612," "VH 1614," and "VH 1616." (DA267). Invoice No. 1390 references the drawing identified as "VH 1700," and seeks $3,105.68 for fiber conduit. (Compl. Ex. 19 at 2; DA176). On August 8, 2016, WAPA emailed Isolux various revisions, including revisions to the drawing titled "VH 1700, Rev. A." (DA267). It is clear that Isolux received these amendments and they became part of the Contract prior to E&I's takeover. Because Invoice Nos. 1386, 1388, 1389, and 1390 pertain to design specifications and changes that predate E&I's takeover as prime contractor, denial of those invoices cannot form the basis of a breach of contract claim and the United States is entitled to summary judgment.

Invoice Nos. 1346, 1391, and 1420, all pertain to the Solicitation's Amendment 2 drawings, which were publicly posted online on July 24, 2015. (Compl. Ex. 4 ("Am. 2 Posting"); DA63, 181–83, 251–55). The Amendment 2 drawings were publicly available long before E&I bid for the contract. (*See* Compl. Ex. 4 (showing the "Amendment 2" hyperlink and July 24, 2015 posting date stamp)). Furthermore, as discussed in Section II(B)(i) above, a fixed-price term places the risk of loss for underbidding or misjudging the costs of performance on the contractor. FAR § 16.202-1; *Widnall*, 132 F.3d at 1451. In agreeing to Paragraph 14 of the Completion Agreement, E&I represented that it had reviewed all amendments, which included Amendment 2, and agreed that the costs associated with Invoice Nos. 1346, 1391, and 1420 were accounted for in the all-inclusive Completion Price term. Therefore, denial of those invoices seeking additional compensation cannot form the basis of E&I's breach of contract claim.

Referencing these invoices, E&I contends it "did not incorporate those costs in [its] bid because [E&I was] never given proper drawings[.]" (Pl.'s Opp. at 11). This rebuttal references specifications that E&I admits "were publicly available," but argues that the contracting officer never pointed E&I to those specifications. (*Id*. at 12). This argument is unpersuasive with respect to those drawings that were public. E&I represented that it had examined the contract and its amendments and was familiar with those documents. (Completion Agreement § 14). Therefore,

the United States is entitled to summary judgment on claims which rely on Invoice Nos. 1346, 1391, and 1420.

The United States asserts that Invoice No. 1422, seeking $32,113.37 for adding pull wires, also relates to Amendment 2. (Def.'s MPSJ at 13; DA257; Compl. Ex 19 at 3). However, after examining the documents the United States relies on, the Court is unable to reach a conclusion as to Invoice No. 1422 and therefore summary judgment is inappropriate concerning claims related to that invoice.

The United States is entitled to summary judgment on claims which rely on Invoice Nos. 1346, 1383, 1386, 1388, 1389, 1390, 1391, and 1420. However, the United States has failed to demonstrate that there are no disputed issues of material fact with respect to Invoice No. 1422, thus it is not entitled to summary judgment on related claims.

> iii. <u>E&I has stipulated that it failed to abide by the Contract's changes clause, entitling the United States to partial summary judgment.</u>

Third, the United States seeks summary judgment on sixteen invoices—Invoice Nos. 1033, 1034, 1040, 1041, 1042, 1275, 1276, 1278, 1280, 1387, 1395, 1404, 1408, 1413, 1414, and 1419—for change orders WAPA denied because E&I did not follow the Contract's changes clause. (Def.'s MPSJ at 14–15). The United States points to the RCFC 30(b)(6) deposition of E&I's President Jeffrey Bruce in asserting that "E&I stipulated that it did not comply with the Contract's procedural requirements for these invoices." (*Id.* at 14–15). In that deposition, E&I's representative stipulated that several invoices were handled by "field directives." (DA358). The testimony clearly references that Invoice Nos. 1042, 1276, 1384, 1395, 1404, and 1414 were handled using "field directives." (DA358–68). E&I later clarified that "field directives" meant oral discussions, rather than any written authorization. (Oral Arg. Transcript at 14–16).

The Follow-On Contract specified that the Contracting Officer, Jonathan Dittmer, had the sole authority to act on behalf of the United States to assign additional work, issue changes, alter the terms or price, accept non-conforming work, or waive any requirement of the contract. (Follow-On Contract at 8). The Follow-On Contract also incorporated the standard changes clause, FAR § 52.243-4, which required E&I to notify WAPA in writing within 20 days of performing any work pursuant to a change order from the Contracting Officer. (*Id.* at 28). That provision states in relevant part:

> (b) Any other written or oral order (which, as used in this paragraph (b), includes direction, instruction, interpretation, or determination) from the Contracting Officer that causes a change shall be treated as a change order under this clause; Provided, that the Contractor gives the Contracting Officer written notice stating-
>
> (1) The date, circumstances, and source of the order; and
>
> (2) That the Contractor regards the order as a change order.

13

> *(c) Except as provided in this clause, no order, statement, or conduct of the Contracting Officer shall be treated as a change under this clause or entitle the Contractor to an equitable adjustment.*

FAR § 52.243-4 (emphasis added).

As the Federal Circuit has observed, "the notice provision serves an important purpose in a contract in which *some* government requests are plainly contemplated *under* the contract. Timely written notice differentiates requests the contractor views as outside the contract from those it deems contemplated by the contract." *K-Con Bldg. Sys., Inc. v. United States*, 778 F.3d 1000, 1010 (Fed. Cir. 2015) (emphasis in original). In other words, the purpose of the notice requirement is to avoid the exact situation E&I's demand creates here: it is intended to "give[] the government timely notice of what amounts it might be on the hook for, so that it will not be surprised by money claims later, as well as an opportunity to address demands for more money when it might yet avoid them." *Id*.

E&I argues that it received direct authorization from the Contracting Officer to make changes. (Pl.'s Opp. at 13 (citing Ex. J, ECF No. 46-10)). E&I also argues it submitted written notices for some change orders within the required 20-day period. (*Id*. at 14 (referencing Invoice Nos. 1275, 1387, and 1395)). These arguments are simply not supported by the records to which E&I cites. Exhibit J is a single page of a deposition—apparently that of Jonathan Dittmer, the Contracting Officer—in which the deponent agreed only that they were "where the buck stops," and "where the customer would have been coming to[.]" (Pl.'s Opp. Ex. J.).[7] Moreover, for the three invoices for which E&I alleges notice was submitted within the required 20-day period, E&I's own brief quotes dates of work that precede the submission of notice by more than 20 days. (*See* Pl.'s Opp. at 14).

Twice, E&I has conceded that it did not comply with the written notice requirement of the changes clause for these invoices. (DA358–63 (testimony of E&I President Jeffrey Bruce); Oral Arg. Transcript at 14–16 ("It's one of those 'a wink's as good as a nod' type of thing as far as from Mr. Bruce's perspective, is he had authorization from the daily conversation, but not written authorization to invoke.")). The Court must take E&I at its word—it failed to follow the changes clause with respect to submitting written notice of work performed under these sixteen invoices. Therefore, the United States is entitled to summary judgment on Invoice Nos. 1033, 1034, 1040, 1041, 1042, 1275, 1276, 1278, 1280, 1387, 1395, 1404, 1408, 1413, 1414, and 1419.

   iv. <u>Several invoices are unsupported by documentation or repudiated by E&I's internal documents.</u>

The United States argues that E&I's claims related to Invoice Nos. 1039, 1277, 1357, 1384, 1385, 1421, and 1423 are unsupported by evidence or repudiated by E&I's internal records such that the United States is entitled to partial summary judgment. (Def.'s MPSJ at 7, 15).

---

[7] Curiously, the page cuts off after the questioner asks "[a]nd you concede that the engineers were giving E&I directives in the field; yes?" (Pl.'s Opp. Ex. J.).

The United States points out that Invoice Nos. 1039, 1277, 1357, and 1421 are annotated "NO GO," Invoice Nos. 1384 and 1385 are annotated "DO NOT BILL," and Invoice No. 1423 was part of a list of invoices designated as "ON HOLD." (DA286–91, 274). The United States asserts these annotations and designations are conclusive evidence that E&I concedes the United States is not responsible for payment of those invoices. (*Id*. at 16). Setting aside the self-defeating annotations, the United States points out that these seven invoices are "devoid of any support, other than a single piece of paper" that the work shown was actually performed. (Def.'s Reply at 11, ECF No. 56). Indeed, during his deposition, E&I President Jeffrey Bruce testified that he was aware that WAPA had denied these seven invoices for lack of supporting documentation, and acknowledged that as of that deposition, E&I had still failed to provide supporting documentation to support its claims in this Court. (DA364–68).

E&I counters that the invoices alone are sufficient evidence to overcome a motion to dismiss. (Pl.'s Opp. at 15–16). But Mr. Bruce's testimony was that E&I has yet to back up these invoices with any other evidence that the work reflected on them was actually done. (DA364–68). During Oral Argument on April 7, 2021, E&I admitted that in proving up these invoices at trial, E&I would rely solely on Mr. Bruce's testimony. (Oral Arg. Transcript at 18:22–25, ECF No. 60). But Mr. Bruce couched all of his deposition testimony regarding those invoices in guesses rather than asserting personal knowledge of the work performed. (DA364–68). Moreover, as the United States pointed out during Oral Argument, E&I has not even provided supporting affidavits regarding these invoices. (*Id*. at 21:10–15).

"One way that a moving party can demonstrate that no material fact is genuinely disputed is by showing that the non-moving party lacks evidence needed to prove an essential element of its claim." *Bannum, Inc. v. United States*, No. 19-506C, 2021 WL 71549, at *4 (Fed. Cl. Jan. 8, 2021); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) ("[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."). "The moving party must do more than merely assert that the non-moving party has not produced enough evidence, but the moving party may show that a fact cannot be genuinely disputed by showing 'that an adverse party cannot produce admissible evidence to support the fact.'" *Bannum*, 2021 WL 71549, at *4 (quoting RCFC 56(c)(2)); *see also Mirror Worlds Techs., LLC v. Facebook, Inc.*, 800 F. App'x 901, 910 (Fed. Cir. 2020) (requiring the moving party to show that sufficient evidence cannot be produced by the non-moving party and denying summary judgment, in part, because discovery was still open).

Discovery in this matter is now closed and the opportunity to produce those supporting documents has passed. (Scheduling Order, ECF No. 19). Therefore, E&I lacks the ability to produce the documents needed to support an essential element related to those claims: that the work was actually performed. As a result, the United States is entitled to summary judgment on Invoice Nos. 1039, 1277, 1357, 1384, 1385, 1421, and 1423.

### C. The claims in Paragraph 36(4) are either unsupported by evidence or are unripe.

In E&I's Complaint, Paragraph 36(4), E&I seeks $209,811.24 which it asserts represents the "[a]mount owed to E&I resulting from WAPA's breaches of contract and E&I's resulting reliance on its bonds." In support of that claim, E&I attaches Exhibit 21 detailing amounts claimed related to three subcontractors. (Compl. Ex. 21). The United States asserts, and E&I

15

does not dispute, that these claims anticipate amounts not-yet-claimed by those subcontractors against E&I's bond. (Def.'s MPSJ at 16). The United States argues that it is entitled to summary judgment on these claims because "E&I has failed to produce any evidence supporting [those] claims" or "demonstrating that [those] claims even represent a justiciable case or controversy." (*Id*.).

As described in Section B(iv) above, the fact discovery period is now closed, and E&I has failed to support these claims with documentation that could cause a reasonable factfinder to believe E&I was entitled to relief. *See Mirror Worlds Techs., LLC*, 800 F. App'x at 910. If subcontractors *had* made claims against E&I's bond, it is too late to produce documents to support that claim. If subcontractors have not yet made a claim to the bond company, or the bond company has not yet made a claim to E&I, then E&I's claim against the United States is unripe. Either way, the United States is entitled to summary judgment on these claims.

      D.  *The United States is entitled to Judgment on the Pleadings with respect to Count V.*

In its Complaint, Paragraph 36(6), E&I requests that "WAPA rescind the Termination for Default." This claim is encapsulated in Count V of E&I's Complaint, for which E&I seeks an order that converts the termination to one of convenience. (Compl. at 31–32, 34). In a fixed price construction contract, "[a] termination for default may be converted to a termination for convenience of the government only where the contractor can establish that '[t]he delay in completing the work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor.'" *Morganti Nat., Inc. v. United States*, 49 Fed. Cl. 110, 132 (2001), *aff'd,* 36 F. App'x 452 (Fed. Cir. 2002) (citing F.A.R. 52.249–10(b)); (Follow-On Contract at 28 (incorporating FAR 52.249–10)). Termination for default is proper when the Contracting Officer determines "that there was no reasonable likelihood that the contractor could perform the entire contract effort within the time remaining for contract performance." *Empire Energy Mgmt. Sys., Inc. v. Roche*, 362 F.3d 1343, 1357 (Fed. Cir. 2004).

In E&I's Motion for Partial Summary Judgment, it argues that the termination should be "converted to a termination for convenience because the delays contributing to E&I's failure to timely complete the project were both unforeseeable and out of the control of E&I." (Pl.'s MPSJ at 7). In support, E&I repeats the misrepresentation arguments this Court has previously heard and rejected. (*Id*. at 11). For the first time, E&I also divulged that by volunteering to pay Isolux subcontractors and vendors, it placed itself in financial jeopardy which impeded the completion of the project. (*Id*. (arguing that it was "*nearly* able to complete the project" despite "hemorrhaging money [from] having to pay for Isolux's subcontractors" and "drastically reduc[ing] its work force[.]") (emphasis added)). This declaration, despite its apparent credibility, does not afford a basis for relief.

Those admissions are fatal to E&I's claims with respect to Count V. E&I's self-defeating arguments reveal that the delays were not beyond E&I's control, but rather a product of its own actions—particularly E&I's voluntary extracontractual payments to Isolux subcontractors and vendors. Seizing on these admissions, the United States' Response also included a Motion for Judgment on the Pleadings with respect to Count V. In that Response and Motion, the United States argues that the Court's earlier decisions foreclose E&I's misrepresentation arguments, and

highlights E&I's admissions that the delays were caused by its financial difficulties. (Def.'s MJP at 4, 8).

Under RCFC 12(c), a party may move for judgment on the pleadings "where there are no material facts in dispute and the [moving] party is entitled to judgment as a matter of law." *Forest Labs., Inc. v. United States*, 476 F.3d 877, 881 (Fed. Cir. 2007). RCFC 12(c) incorporates the same standards as a Rule 12(b)(6) motion to dismiss for failure to state a claim—the Court "must assume each well-pled factual allegation to be true and indulge in all reasonable inferences in favor of the nonmovant[.]" *Owen v. United States*, 851 F.2d 1404, 1407 (Fed. Cir. 1988).

In its Motion for Partial Summary Judgment, E&I explains that it was unable to complete the project because it was facing "financial issues after paying Isolux's subcontractors and [paying] for missing equipment[.]" (Pl.'s MPSJ at 11). E&I admitted that it "started reducing personnel and equipment on the project site in February 2018[,]" well in advance of the April 3, 2018 completion deadline. (*Id.*). It blames these reductions on its aforementioned financial issues. (*Id.* at 6). E&I also candidly admits that its financial distress was, in large part, because the Sureties were allegedly slow to reimburse E&I or to make payments to Isolux subcontractors and vendors outright. (*Id.* at 15).

These justifications conclusively demonstrate that E&I's delay was neither unforeseeable nor beyond E&I's control. As discussed in *E&I Glob. Servs. I*, *E&I Glob. Servs. II*, and reiterated in parts of this Opinion, E&I was contractually prohibited from making payments to Isolux subcontractors and vendors. It ignored that restriction and made numerous payments voluntarily. Whether the Sureties bear responsibility for being dilatory in their obligations to pay subcontractors and vendors is not for this Court to decide. However, the Court has made it abundantly clear that E&I's remedy for the extracontractual payments it made does not lie against the United States or its taxpayers. E&I's extracontractual payments caused it financial hardship, which in turn caused E&I to be unable to complete the project. When the April 3 deadline elapsed, the project remained unfinished. And so, on May 18, 2018, the United States properly exercised its right to terminate E&I for default. (Notice of Termination, Compl. Ex. 14).

E&I has effectively conceded that the conditions of its default were neither unforeseeable nor beyond its control. Its financial undoing was the product of its own contractual violations which, in turn, rendered E&I unable to finish the project. Consequently, the United States is entitled to judgment on the pleadings with respect to Count V.

### III.  Conclusion

After reviewing the parties' extensive briefing, the Court concludes that several issues of material fact remain. However, the United States is entitled to partial relief. The United States is entitled to summary judgment on claims related to Invoice Nos. 1033, 1034, 1039, 1040, 1041, 1042, 1275, 1276, 1277, 1278, 1280, 1346, 1357, 1378, 1379, 1381, 1383, 1384, 1385, 1386, 1387, 1388, 1389, 1390, 1391, 1395, 1404, 1408, 1410, 1411, 1413, 1414, 1419, 1420, 1421, and 1423. The United States is entitled to summary judgment on the claims related to Complaint Paragraph 36(4) (and Complaint Exhibit 21) because either E&I is unable to support those claims with admissible evidence, or the claims are unripe. Because E&I's own arguments and admissions demonstrate it cannot satisfy the requirements for the Court to convert a default

termination to a termination for convenience, the United States is entitled to judgment on the pleadings with respect to Count V.  Summary judgment is partially denied with respect to Complaint Paragraph 36(1), and denied with respect to Invoice No. 1422.

Accordingly, the Court Orders the following:

(1) The United States' Motion for Partial Summary Judgment, (ECF No. 42), is **GRANTED-IN-PART** and **DENIED-IN-PART.**

(2) E&I's Motion for Partial Summary Judgment, (ECF No. 50), is **DENIED.**

(3) The United States' Motion for Judgment on the Pleadings, (ECF No. 53), is **GRANTED.**

(4) The Court will hold a status and scheduling conference on April 29, 2021 to discuss the remaining issues and set this matter for trial.

**IT IS SO ORDERED.**



s/     David A. Tapp
DAVID A. TAPP, Judge